WORTH K. RICE v. CITY OF ST. PAUL AND OTHERS.[1]

November 15, 1940.

No. 32,468.

[1]Reported in 295 N. W. 529.

510

*John W. McConneloug* and *Edwin Murphy,* for appellants City of St. Paul and its officials.

*Mark H. Gehan,* for appellant Automatic Voting Machine Corporation.

*John A. Burns,* for respondent.

JULIUS J. OLSON, JUSTICE.

A taxpayer's suit against the city of St. Paul, its officers charged with the duty of making contracts in its behalf, and Automatic Voting Machine Corporation, to enjoin them from entering into a contract for the purchase of voting

machines, and to declare null and void all proceedings had in respect thereto, resulted in findings for the plaintiff. Defendants' motions for new trial were denied, and they "and each of them" appeal. Since the appeal was perfected (the record and briefs being duly filed here) the city and its officers have moved to dismiss the appeal as to them. Plaintiff now moves to dismiss the appeal as to the remaining defendant, Automatic Voting Machine Corporation.

The action was begun September 1, 1939. Plaintiff at the same time served notice of motion and an order to show cause why a temporary injunction should not issue pending trial and a temporary restraining order preventing defendants from any further proceedings being had until the court heard the motion. On September 18 the temporary injunction was denied and the restraining order quashed. Whereupon, on that day, the comptroller of the city completed the execution of the contract by countersigning it in his official capacity. (The instrument bears date September 5.)

Trial was duly had upon issues appropriately framed. The court found the contract void in two respects:

(1) That "there was not sufficient money in the proper fund in the treasury of the city, or otherwise, to pay for said machines, or to pay the first instalment" due July 1, 1940, "or any subsequent instalments," as required by §§ 285, 286, and 315 of the St. Paul home rule charter.

(2) That "there is a fatal variance between the specifications in the call for bids and the bid or proposal made by the Automatic Voting Machine Corporation, both of which were made a part and parcel of the contract * * * in that the call for bids called for a purchase and sale on the so-called 'rental-purchase plan' whereas the contract as entered into provided for a sale and purchase on the 'deferred payment plan,' carrying an interest item of" $49,520.25

"over a period of ten years which item was not suggested in the call for bids." The court found that there was, however, "no fraud, or fraudulent collusion" on the part of defendants in entering into the contract.

Only one bid was submitted, that being the one submitted by the voting machine corporation. The court was of opinion that certain provisions of the charter prevented the making of this contract. Section 315 of the charter is the alleged stumbling block. It provides:

"No contract shall be signed by the comptroller until provision shall have been made for sufficient money in the appropriate fund to meet the indebtedness incurred by such contract."

Defendants rely upon the provisions of L. 1939, c. 345, and more particularly Part 8, c. 1, 3 Mason Minn. St. 1940 Supp. §§ 601-8(1) to 601-8(1)u. That enactment provides that the governing body of any municipal corporation such as St. Paul may (§ 1) "provide for the use of voting machines in any one or more districts thereof, at all elections to be held therein"; (§ 2) it "may provide for the experimental use of voting machines in one or more districts without formal adoption thereof"; (§ 9) such governing body "is hereby authorized to purchase for the use of each district in which it has authorized the use of voting machines, one or more such machines in complete working order"; (§ 11) "payment of such machines may be provided for in such manner as is deemed for the best interests of the political division adopting and purchasing them, and each municipal corporation is hereby authorized for said purpose, to appropriate money from the general fund, to levy a tax in the same manner as other taxes are levied or to issue and sell bonds or other certificates of indebtedness, which shall be a charge upon such municipal corporation so adopting and purchasing such voting machines, and to provide for the payment and redemption thereof, at maturity."

And the same section further provides that the bonds or certificates of indebtedness may be issued by a majority vote of the governing body "notwithstanding any provision contained in any home rule charter or law of this state." Interest not exceeding six per cent per annum upon such obligation is permitted, and the obligations "may be issued exclusive of and in addition to any limit of indebtedness fixed by the charter." "By a majority vote of its governing body" the municipality may "enter into a contract for the purchase" of such machines "on a rental-purchase or deferred payment plan. Such contracts may provide for the annual rental of the voting machines at a definite amount with such annual rentals applied towards the purchase price of the voting machines." Section 12 provides that "all laws and parts of laws inconsistent herewith shall be suspended in each election district wherein such voting machines are used, so long as the same shall be used therein."

Over a period of nearly five years before the present contract was executed the officers of the city had been discussing and considering "the advisability of using election voting machines." After many meetings of its election committee a plan was finally evolved whereby such machines were to be acquired upon a "time payment," "partial payment," or "deferred payment" plan. (The witnesses used these expressions synonymously.) Such method of payment was considered "the determining factor." Respecting rate of interest, "the city would not enter into any contract of any kind where the interest would be in excess" of 2.75 per cent. Then "the common bond interest" rate in St. Paul "was around" 2.9 to 3.1 per cent. The city officials also thought it was good business policy to acquire these machines because by using them they could reduce the number of voting precincts in the city, and this would result in savings amounting to at least $10,000 during the year 1940 alone. As a matter of fact 30 such machines had been rented at a rental charge of $3,750. These had

been put to use and were in use prior to the time of entering into the present contract, which is for the acquisition of 325 machines. A summary of the cash price for each machine, the total amount involved, payments to be met, including interest, and dates when maturing, is found in Exhibit C, which reads:

## "SUMMARY

| | |
|---|---:|
| 325 Machines at 1,080.00 each | 351,000.00 |
| Accrued Interest | 49,520.25 |
| | 400,520.25 |
| Less: Applied Rental | 3,750.00 |
| | 396,770.25 |

### Scheduled Payments

| | Principal and Interest | Title to Number of Machines |
|---|---:|:---:|
| July 1, 1940 | 10,000.00 | .. |
| July 1, 1941 | 59,069.50 | 55 |
| July 1, 1942 | 36,409.75 | 30 |
| July 1, 1943 | 36,409.75 | 30 |
| July 1, 1944 | 36,409.75 | 30 |
| July 1, 1945 | 36,409.75 | 30 |
| July 1, 1946 | 36,409.75 | 30 |
| July 1, 1947 | 36,409.75 | 30 |
| July 1, 1948 | 36,409.75 | 30 |
| July 1, 1949 | 36,409.75 | 30 |
| July 1, 1950 | 36,422.75 | 30 |
| | 396,770.25 | 325 |

NOTE: If contract is paid before maturity, interest will be recomputed on a reducing balance basis.

NOTE: The foregoing schedule of payments as submitted herein is based on the requirements that no voting machines

covered by such payments shall, while in the possession of the City, be subjected to any Personal Property or Use tax and that in the event such taxes should be imposed, the City will agree to pay an additional rental payment equal to any such taxes imposed."

The contract provides that as payments are made title to the number of machines mentioned in the third column vests in the city. To be noted is the fact that the city is credited with the $3,750 rentals upon the total amount involved in the transaction.

First to be considered is plaintiff's motion to dismiss the appeal of Automatic Voting Machine Corporation. As already noted, all "defendants and each of them" have appealed. Joint briefs were made, printed, and filed. Less than eight days before the cause was set for oral argument here the city and its officers moved to dismiss their appeal, and to this plaintiff has consented. The remaining defendant resists the motion, claiming that contract rights are involved; that whether these are sustainable or otherwise is a question to be determined on this appeal; that its rights and obligations under the contract compel the conclusion that it is an *interested party* and as such would be "adversely affected" if the decision below is to stand.

Plaintiff claims the appeal should be dismissed because the remaining defendant has asked for no affirmative relief as against plaintiff; that the "appeal presents no material question to the court for determination"; that defendant corporation cannot have determined its rights as against the city and its officers in this proceeding; and that its relief, if any there be, "is by a plenary action against said city and its proper city officials."

■ We think the problems presented go to the validity of the contract and that the mentioned defendant has a vital interest in seeking to maintain it. If the city had refused to appeal in the first instance it would seem that this appellant could have appealed and served notice there-

of upon plaintiff, the city, and its officers. Since the city and its officers joined in the appeal and carried it to the point of making their brief a joint one, we think the conclusion is inescapable that this appellant has a right now to be heard. This court undoubtedly acquired jurisdiction by virtue of the appeal, and that jurisdiction extends to both subject matter and parties. Appellant was and still is a party to this cause—an adverse party. That it was "aggrieved" by the result reached below is obvious. Equally clear it must be that it has a direct and material interest in that result. Were we to hold with plaintiff the result probably would be that the cause would have to go back for entry of judgment, and the same question would be with us again on appeal therefrom. We think the rule applied in Rendahl v. Hall, 160 Minn. 502, 504, 200 N. W. 744, 940, and cases there cited, should be followed. (On this phase, cf. 4 C. J. S., Appeal and Error, §§ 391 to 393.) Williams v. Klemmer, 177 Minn. 44, 48, 49, 224 N. W. 261, relied upon by plaintiff, is not of aid here. There the rights of the city and the truck company (its supposed contractor) were not affected by the judgment because they were not parties to the cause. The motion to dismiss is denied.

We shall proceed directly to a consideration of the two supposed barriers deemed adequate by the court to defeat the contract.

■ The first is that "there was not sufficient money in the proper fund in the treasury of the city" to pay for the machines and as such was violative of the cited charter provisions. In so holding the court necessarily determined that the general law (L. 1939, c. 345, Part 8, c. 1) upon which defendants rely, was not controlling. It is well to bear in mind that our constitution, art. 4, § 36, preserves the legislative power to enact "general laws relating to affairs of cities, * * * which shall be *paramount* while in force to the provisions relating to the same matter in-

cluded in the local charter." (Italics supplied.) That L. 1939, c. 345, is such a general law is apparent upon its face. Nor will anyone deny that the conduct of elections is one of state concern. Authority to acquire and use voting machines by municipalities is specifically granted, and so also is the power "to appropriate money," "to levy a tax in the same manner as other taxes are levied or to issue and sell bonds or other certificates of indebtedness," and this "notwithstanding any provision contained in any home rule charter or law of this state." In its memorandum the court concedes as much, for it said that "certainly it appears that bonds or certificates of indebtedness could have been issued by the city to make the purchase, for the statute says so." But the court drew a distinction between obligations thus to be incurred and the type here involved, quoting the third paragraph of § 11, which authorizes the municipality to "enter into a contract for the purchase of voting machines on a rental-purchase or deferred payment plan" but which does not contain the proviso "notwithstanding any provision contained in any home rule charter," a clause contained in the preceding portion of the same section. In arriving at this conclusion the court permitted introduction of evidence to the effect that before the third paragraph of § 11 was included therein the conference committees of the house and senate eliminated it from the clause last quoted. Therefore, so the court thought, there was an indication "that the lawmakers did not intend that municipal corporations should buy on time or on rental-purchase plans contrary to provisions against it in" home rule charters. In reaching this conclusion the court evidently deemed unimportant, or at least inapplicable, that portion of the section which provides that "payment of such machines *may be provided for in such manner as is deemed for the best interests of the political division adopting and purchasing them.*" (Italics supplied.) The distinction drawn by the court appears to be one of

extreme refinement. Clearly, the statute grants general authority to acquire voting machines. The method of paying for them—whether cash, tax levy, issuance of bonds, or certificates of indebtedness, or by "rental-purchase or deferred payment"—is left optional with the municipality. That portion of the section to which the court referred affords but another alternative method to be used if its officers deem such to be for its "best interests."

In State ex rel. Benson v. Peterson, 180 Minn. 366, 230 N. W. 830, this court had for consideration the question of whether L. 1929, c. 57, violated Minn. Const. art. 4, § 36. The city of Eveleth was operating under a home rule charter, and under its provisions had complete control respecting its fire department. The contention was made that under art. 4, § 36, the city charter could be amended only by submission of such to its voters; hence that the legislative act violated this constitutional provision. But the court thought otherwise, saying (180 Minn. 376, 377, 230 N. W. 834):

"It is clear from a reading of the entire section [36] that this limitation as to the making of amendments is directed to and applies only to action by the city or village and its officers and electors to amend the charter, and is not a limitation upon action by the legislature. * * * *There is here not only no limitation on the power of the legislature, but an express power to legislate as to the affairs of cities having home rule charters—the only limitation being that the legislature must act through general laws.*" (Italics supplied.)

In that case the legislative act (L. 1929, c. 57) made no reference to home rule charter municipalities, yet this court decided that the act, being a general law, was superior to the charter provisions and as such controlling.

And so here. By reading the entire statute relating to voting machines, and particularly § 11, no doubt is left that

it is clear and free from uncertainty or ambiguity. In that situation judicial duty requires that we give to the language chosen its plain meaning, since it is "only where the language of an act is ambiguous, and needs, by reason of such ambiguity, to be judicially construed, that the history of such act or its title should be resorted to for aid in its construction." Town of Hinckley v. Kettle River R. Co. 80 Minn. 32, 37, 82 N. W. 1088, 1089. Or, as stated in Railroad Comm. of Wisconsin v. C. B. & Q. R. Co. 257 U. S. 563, 589, 42 S. Ct. 232, 238, 66 L. ed. 371, 383, 22 A. L. R. 1086: "But when, taking the act as a whole, the effect of the language used is clear to the court, extraneous aid * * * cannot control the interpretation." (Citing cases.) Therefore, proof of such extraneous matters as the court permitted here "may properly be resorted to *only to solve doubt * * * not to create it,* and such legislative history may not be used to support a construction which adds to, or takes from, the significance of the words employed." (Italics supplied.) 70 A. L. R. Anno. pp. 17 and 18, and cases cited under notes 16 and 17.

We think, and so hold, that this statute is a "general" law "relating to affairs of cities" and as such is "paramount" to the charter provisions mentioned and must be given full force and effect. Of course we are not to be understood as holding or deciding that these charter provisions are in any other way limited or superseded. We are considering and deciding only the matter of voting machines—nothing else.

■ The court was "inclined to believe that there is a fatal variance between the specifications (in the call for bids) as to the plan of payment, and the proposal made" by the voting machine corporation so "as to void the contract made with it." It considered the call for bids to be "a rental-purchase plan," whereas the proposal or bid by the company was "a sale and purchase on the 'deferred payment plan'" since deferred payments were to bear in-

terest at 2.75 per cent. The court was however in some doubt about this for it said in its memorandum that "whether the court has too strictly applied" the rule laid down in Diamond v. City of Mankato, 89 Minn. 48, 93 N. W. 911, 61 L. R. A. 448, and City of Bemidji v. Ervin, 204 Minn. 90, 282 N. W. 683, "or not, there is one more point, which in my opinion is the most important question in the case, * * * fatal to defendants' position," namely, that the contract violated the St. Paul charter provisions. (These have been considered and disposed of under the second subdivision of this opinion.)

Some additional facts should now be recited. There are only two voting machine manufacturers in this country, the present appellant and the Shoup Voting Machine Corporation. Only appellant has complied with our law in respect to submission to and securing approval of its machine by the Minnesota Voting Machine Commission. The specifications invited bids or proposals on the "rental-purchase" plan for 325 machines of a type approved by our state commission. Bidders were required to state their cash as well as deferred payment prices, and to furnish a detailed schedule of the terms of payment and the number of machines to which the city was to be given title as annual payments were made. They were informed that payments should be spread over a period of ten or more years; that the first annual payment would be made by the city in two parts, $10,000 on or before July 1, 1940, and the balance of the first payment, whatever that amount might be and which was to be determined by the successful bid, should be payable on or before July 1, 1941. The city was to make the first payment for the use of the machines in 1940, but it was to be optional with the city thereafter to cancel the contract and return the machines.

The bid provides for 11 equalized payments running over a period of ten years, each in the amount of $36,409.75 (except the last falling due in 1950, which is $36,422.75).

The first equalized payment was divided into two installments, $10,000 due July 1, 1940, and the balance, $26,409.75, to be paid July 1, 1941. If the city then concludes to discontinue the contract it may do so without further obligation. If it does not cancel its contract then it will be required to pay $59,069.50 instead of $26,409.75, when title to 55 machines will vest in the city. Credit for $3,750 is to be allowed because the city had theretofore paid this amount as rent for 30 such machines. The cash price for each machine is $1,080. As we have seen, the summary heretofore quoted states when and as title to the machines, as payments are made, will pass to the city.

From what has been recited it seems clear that what the city is paying for until the 1941 payment has been met is rental 'for the total number of machines up to that time. If it elects to continue the contract by making the second payment it then becomes a purchaser to the extent of 55 machines. The contract is a combination of rental and purchase with the option to the city to take its own course in the future as its best interests may then appear to be.

The interest item is the one the court thought fatal to the consummation of a valid contract. It has assumed that thereby the city has agreed to do something that it had not proposed to do when it submitted its call for bids; hence that it has given the one bidder an advantage not offered generally. In this connection it is well to note that the specifications contained these provisions:

"1. Payment shall be made on a rental purchase plan, with equal annual installments spread over a period of ten years or more.

\* \* \* \*

"3. After the first two annual payments shall have been made, title to machines shall be conveyed to the city of Saint Paul annually for as many machines as the amount paid by the city to that time on the principal sum or cash price of the machines will fully pay for at said cash price.

"5. Each bidder shall state the cash price of each voting machine and the terms of payment in detail, and shall include the detailed schedule of the number of machines, title to which is to be delivered to the city annually during the term of the contract."

We think it must be apparent to anyone that the city could not expect to pay upon a cash price basis when the payments were to be spread over a period of ten or more years. That is why, in addition to requiring bidders to "state the cash price" for each machine, it also required them to state "the terms of payment in detail" and to include a "schedule of the number of machines, title to which" was to pass to the city as the deferred payments matured. The fact that the bidder labeled and placed the interest item in a separate column could do no more than to disclose to the city the basis upon which the annual payments were founded. If it had said nothing about this item or had left out entirely the basis upon which it computed these payments, no one could say that the bid failed to meet the specifications. The equalized annual payments set out in the first column and the number of machines as to which title would pass at stated times, set out in the column to the right, fully met the specifications. No one was or could be misled. We think the proposal and specifications were "so framed as to permit full and free competition"; that any and all bidders had an equal "opportunity to compete"; and that the bid made was neither a "substantial" nor a "material departure from the specifications" furnished. City of Bemidji v. Ervin, 204 Minn. 90, 95, 282 N. W. 683, 685, 686.

There is no question about the soundness of the rule stated in the two cases cited by the court, that "when public bidding is required, the proposals and specifications must be so framed as to permit full and free competition, so that all bidders will have an opportunity to compete for a contract containing *substantially* the same terms and pro-

visions, and that any *substantial and material departure* from the specifications, beneficial to the successful bidder, in the contract entered into will render same void, notwithstanding the fact that it appears there was only one bid." (Italics supplied.) (204 Minn. 95, 282 N. W. 685.) Tested by this "well-established doctrine," the facts require findings sustaining the contract.

The cause has been fully and ably tried. It should be disposed of without further delay. Upon this record there should be findings made upholding the contract. The orders here for review are reversed and the cause remanded to the trial court to so amend its findings and conclusions of law as to be in harmony with this opinion.

Reversed and remanded.

