WALTER A. COLLER v. CITY OF ST. PAUL AND THE DUAL PARKING METER COMPANY.[1]

March 21, 1947.

No. 34,338.

---

[1]Reported in 26 N. W. (2d) 835.

*Briggs, Gilbert, Morton, Kyle & Macartney,* for appellant.

*Bruce J. Broady,* Corporation Counsel, and *Ira Karon,* Assistant Corporation Counsel, for respondent City of St. Paul.

*Morgan, Chase, Headley & Hoshour, D. W. Raudenbush,* and *Black, McCuskey, Souers & Arbaugh,* for respondent Dual Parking Meter Company.

PETERSON, JUSTICE.

Suing as a taxpayer, plaintiff seeks to annul the award, made in competitive bidding, by defendant city of St. Paul of a contract to

defendant The Dual Parking Meter Company for the purchase and installation of 1,070 parking meters and to enjoin the city and the company from entering into or performing the contract pursuant to the award.

The questions presented are (1) whether a proposal in Dual's bid to install the meters according to the method set forth in its specifications was an alternative to the method specified by the city in its specifications or a substitute therefor; (2) whether, if Dual proposed its method as a substitute for that of the city, the city was required to reject the bid because it did not conform to the city's specifications; (3) whether the city was required to reject the bid for the further reason that Dual excepted from its bid the requirement of the city's specifications that the bidder furnish at its expense an expert serviceman to service the meters during the six-month trial period following installation thereof; and (4) whether after the bids had been received and opened it was permissible for Dual to modify its bid by agreeing to install the meters according to the city's specifications and to withdraw the exception as to furnishing the serviceman and for the city and Dual to enter into a contract for furnishing and installing the meters upon the basis of its bid as thus modified.

The letting of the contract was under §§ 296 to 299 of the St. Paul city charter, requiring contracts for purchases amounting to over $500 to be let to the lowest responsible bidder. The charter contemplates the adoption of formal specifications upon which bids are to be invited, public advertisement of the invitation to bid, formal bidding, and the opening and tabulation of the bids.

The city, having determined to purchase and install parking meters, adopted plans and specifications covering in detail several types of meters and the method of installation. Bids for furnishing and installing the meters were invited. Dual and two others submitted formal written bids on the automatic type of meter, which were opened and tabulated. Since the only points here relate to the requirements in the specifications concerning the method of installation of the meters and the furnishing by the successful bidder

of a serviceman to service the meters during the trial period, only those parts of the specifications will be stated.

The specifications provided for different methods of installation where the meters were to be placed "over basements or other underground obstructions" and where they were to be installed at other places. The specifications for the latter, as interpreted by the city engineer, provided that each meter should be attached to a two-inch steel pipe of standard weight, which was to have a screw or welded flange at the bottom by means of which it was to be fastened to a concrete base built for the purpose. The concrete base was to extend through the sidewalk to a depth of 10 to 12 inches, except that where there were dirt, brick, or poor conditions the depth was to be 18 to 24 inches. There were to be four bolts placed upright in the concrete with the threads at the top for the purpose of attaching by means of nuts and washers the flange at the end of the meter standards. The top of each meter was to be 55 inches above the sidewalk level.

The specifications further provided that the city should have a trial period of six months in which to determine whether it would keep the meters; that during the six-month trial period the contractor— that is, the successful bidder—should provide an expert serviceman to make all repairs, replacements, and adjustments for the efficient and proper operation of the meters. The serviceman was to be available at all times within the city and was to be compensated by the contractor at current city rates. The specifications further provided that the contractor should supply during such period all parts, replacements, and adjustments for the efficient and proper operation of the meters, except in cases of damage caused by forces beyond the control of the contractor; and that at the end of the trial period the contractor should turn over to the city the meters in proper and satisfactory operating condition.

Dual's bid was made on a printed form entitled "FORMAL QUOTATION" furnished by the city's purchasing agent, to which it added proposals and specifications of its own. The trial judge and the parties have treated all the papers in question as constituting Dual's bid, and we shall do likewise. Since the papers annexed to Dual's

bid included information concerning the mechanism of its meters, the method of installation, its experience in the business, various sketches, and other information called for by the invitation to bid, it could not be otherwise if its bid were to be considered as in any manner conforming to the invitation. See, Tufano v. Borough of Cliffside Park, 110 N. J. L. 370, 165 A. 628. Near the top of the printed form there is a recital to the effect that the meters were to be furnished and installed "in accordance with specifications on file in the office of the Purchasing Agent," and near the bottom there is another recital which reads: "In case detailed specifications are necessary, attach same to this form." In the body, among other "ITEMS OF INFORMATION TO BE ATTACHED TO BID," is the item: "(a) Detail of base fastening to sidewalk or slab." For a straight nickel meter (the only kind here involved), Dual bid $64.50. Dual made a part of its bid a "PROPOSAL For the Installation of DUAL Automatic Parking Meters in THE CITY OF SAINT PAUL, MINNESOTA." It began by repeating the offer, contained in the bidding form furnished by the city, to furnish and install the meters at the prices there quoted. In addition, it contained, among others, three provisions which give rise to the present controversy and which read:

"INSTALLATION:

"Quotations are based on installation by the Company and local contractor acceptable to the Municipality under supervision of the Company Engineer, and according to attached specifications, work to be subject to the approval of designated municipal officials.

"SERVICE AND MAINTENANCE:

"The Company's installation engineer will instruct a mechanic in the service and maintenance of the meters."

"EXCEPTIONS:

"* * * We also take exception to the specification requiring that the Company pay the salary of the City's service man for six months. The Company will thoroughly train a mechanic, selected by the City, in the maintenance and operation of the meters and keep in close contact with such installation at all times."

In the attached specifications, Dual proposed to install the meters at places other than over basements and other underground obstructions by setting the pipes or standards in holes through the sidewalk 11 inches deep and filling the holes with quick-setting cement, except that the holes were to be about two feet deep where the standards were to be set in dirt, brick, or bad sidewalks.

There were two other bidders. One, known as Park-O-Meter, bid $57.50 for the meters and added cost of installation for "optional" methods as follows: Company method (same as Dual's) $6.50; bolt flange method, $12; and city's specifications' method, $22. It added also $2 per meter for cost of serviceman. The other bidder, known as Karpark, bid $72.95, in which was included $3 for installation with standard sunk in concrete 12 inches deep "wherever possible." It included $2.60 for cost of servicing meters.

After bids had been received and opened, Dual offered to install the meters in literal compliance with the city's specifications and withdrew the exception as to the furnishing of a serviceman contained in its bid. This offer was renewed upon the trial. The city awarded the contract to Dual. Before the contract was entered into plaintiff commenced this action.

The evidence showed that the purpose of the provisions in the city's specifications calling for meter standards with flanges for attaching them to the concrete bases at sidewalk level was to make it possible to unfasten and remove the standards supporting the meters without tearing up sidewalks and concrete, especially in the winter. This was a matter of some importance, because it is necessary to remove and replace or repair the standards when they have been bent or otherwise injured. The city engineer estimated that it would cost $2 per meter more to install the meters according to the city's specifications. While the precise number of meter installations over basements and other underground obstructions was not stated, the evidence showed that according to experience it was from one to two percent. Because the city engineer had information showing the precise number of the different types of installations and was not asked as a witness to state the facts, we accept the estimates, as ap-

parently the parties did, as stating the facts. On that basis, there were approximately 1,050 installations where the cost would be $2 more per meter according to the city's specifications than according to Dual's, or a gross of about $2,100.

The evidence also showed that during the trial period it is necessary to do considerable adjusting in order to get the meters operating properly and that it might not be possible to obtain competent service for the purpose except from the company installing the meters. The provision in the city's specifications not only makes it the responsibility of the company to provide the service, but it tends to make sure that the service will be in fact rendered. The cost of such service is estimated by those engaged in the business at $2 per meter for a six-month period. Karpark in its bid estimated the cost at $2.60 per meter. There was evidence that a city employe doing similar work would be paid $162.15 per month, or $972.90 for the six-month period. It was assumed that such an employe could be trained to do the work satisfactorily. Dual estimated that the cost to it for providing such service would be at least $230 per month, or $1,380 for the six months; but in contracting for such work it and other bidders included $2 per meter for such service.

The trial judge held that Dual's bid was one to install the meters according to the city's specifications and that the method of installation specified in Dual's specifications was offered as an alternative method at the city's option; that by awarding the contract to install the meters according to the city's specifications the parties in effect adopted the city's method and rejected the alternative; that the exception in Dual's bid as to furnishing a serviceman constituted an immaterial and unsubstantial variance, which could be waived; and ordered judgment for defendants.

■ Whether Dual's bid was a proposal to install the meters according to the city's specifications, or in the alternative at the city's option according to Dual's specifications, or whether Dual proposed installation according to its own specifications as a substitute for those of the city, depends on the construction of the bid. No *express* manifestation of meaning one way or the other appears. The pro-

posal was not labeled as being an alternative one. For lack of an *express* manifestation, the meaning must be gathered from such other tokens thereof as may be found in the bid itself. In this, as in the case of other writings, the instrument should be construed as a whole and its parts harmonized. It must be assumed that it was intended that every part of the bid should have some meaning and that effect should be given to such meaning. Ordinarily, unequivocal proposals followed by specific terms or conditions are deemed to be modified and qualified by the latter, with the consequence that so far as there is any apparent conflict the latter shall control. Batie v. Allison, 77 Iowa 313, 42 N. W. 306; De Jonge v. Hunt, 103 Mich. 94, 61 N. W. 341. In Urbany v. City of Carroll, 176 Iowa 217, 157 N. W. 852, it was held that a proposal in a bid to do the work according to the city's specifications, under which the work was to be completed by November 1, 1916, was qualified by a later specific proposal in the bid to complete the work by December 1, 1916. The court said (176 Iowa 223, 157 N. W. 854):

"* * * Ordinarily, where the specification is in general terms, a subsequent reference thereto in more specific language operates to qualify the words first employed."

So it is here. While Dual proposed on the printed form furnished by the city to install the meters according to the city's specifications, it qualified the proposal by another specific proposal made part of its bid to make the installation according to its own specifications. Its proposal reads:

*"Quotations are based on installation by the Company* * * * acceptable to the Municipality under supervision of the Company Engineer, *and according to attached specifications,* work to be subject to the approval of designated municipal officials." (Italics supplied.)

The attached specifications described in detail Dual's method of installation, which, as pointed out, differed radically from that of the city. Hence, Dual's bid was a proposal to install the meters according to its own specifications as a substitute for the method called

for by those of the city. The quoted language so clearly expresses such a meaning that we could not hold otherwise without rendering it meaningless. Since Dual did not propose to install the meters according to the city's method at all, in the very nature of things its proposal to install the meters according to its own method cannot be construed to be an alternative to a proposal to install them according to the city's method at its option.

Hendricks v. City of Minneapolis, 207 Minn. 151, 290 N. W. 428, is cited as authority for the proposition that a proposal in a bid to make installation according to the bidder's specifications rather than the city's is an immaterial variance; but we think that the case does not so hold. It is authority simply for the proposition that unless such a variance is made to appear an order denying a temporary injunction restraining the city from awarding a contract on the bid should be affirmed. There, the facts with respect to the alleged variance were not clearly shown. The city had adopted no specifications except that the installation was to be done under the supervision of the city engineer. It was not clear from the showing, which was entirely by conflicting affidavits, whether the bidder proposed to make the installation according to his own method or whether it was to be done under the supervision of the city engineer. We said (207 Minn. 154, 290 N. W. 430) : "At the present stage, we see no substantial variance," and in conclusion we held (207 Minn. 156, 290 N. W. 431) : "All the issues remain for final decision below, including that of the right of plaintiff and intervener to sue [and that of whether there is a variance in fact between the bid and the city's specifications]." Here, the situation is different. The facts have been established after trial. It appears clearly that Dual proposed to install the meters according to its specifications and not according to the city's. The Hendricks case should not be understood to hold that a proposal to do work according to the bidder's method instead of according to the specifications on which bids were invited does not constitute a variance.

■ Statutory and city charter provisions requiring competitive bidding in the letting of public contracts require, as necessary cor-

ollaries, that the public officials whose duty it is to let a contract should adopt definite plans and specifications with respect to the subject matter of the contract; that the plans and specifications be so framed as to permit free and open bidding by all interested parties; that a bid shall constitute a definite offer for the contract which can be accepted without further negotiations; and that the only function of the public authority with respect to bids after they have been received shall be to determine who is the lowest responsible bidder. Diamond v. City of Mankato, 89 Minn. 48, 93 N. W. 911, 61 L. R. A. 448; 4 Dunnell, Dig. & Supp. § 6707; 43 Am. Jur., Public Works and Contracts, §§ 23 to 46. It necessarily follows also that a bid must conform substantially to the advertised plans and specifications, and that where there is a substantial variance between the bid and the plans and specifications it is the plain duty of the public authority to reject the bid. City of Bemidji v. Ervin, 204 Minn. 90, 282 N. W. 683; 43 Am. Jur., Public Works and Contracts, § 40. Here, the next question, then, is whether the variance between Dual's bid and the city's plans and specifications was a material one. The test of whether a variance is material is whether it gives a bidder a substantial advantage or benefit not enjoyed by other bidders. City of Bemidji v. Ervin, 204 Minn. 90, 282 N. W. 683, *supra;* Le Tourneau v. Hugo, 90 Minn. 420, 97 N. W. 115. We think that the evidence shows that Dual derived a substantial advantage or benefit over other bidders by bidding on the basis of its own method of installation instead of the method called for by the city's plans and specifications. To begin with, as has been pointed out, its method differed radically from that of the city. The monetary advantage or benefit was at least $2 per meter, or approximately $2,100 in the aggregate. That figure leaves out of consideration such expenses as engineering, supervision of installation, and overhead expense of a contractor in doing the work. We think that the amount is substantial; that the variance is material.

While we do not think that it was necessary to show also that the variance was prejudicial to other bidders (under our rule it makes no difference whether there is only one or several bidders, City of

Bemidji v. Ervin, 204 Minn. 90, 282 N. W. 683, and Le Tourneau v. Hugo, 90 Minn. 420, 97 N. W. 115, *supra*), such prejudice appears here as a fact. If Park-O-Meter had bid on the same basis as Dual— that is, if it had eliminated from its bid the amount of $22 it included for installation according to the city's method and included in lieu thereof for installation according to the same method as Dual proposed $6.50 as the estimated cost thereof and if, in addition, it had eliminated from its bid, as Dual did, the cost of furnishing a serviceman which it estimated was $2 per meter—its bid would have been $59.50 per meter, or $5 less per meter than Dual's. The aggregate amount of the difference would have been $5,350. On that basis it would have been the low bidder. But it did not bid on that basis, and therefore its bid was not considered by the city on the same basis as Dual's.

The exception made by Dual in its bid with respect to furnishing and compensating a serviceman to service the meters during the trial period also constituted a material variance. While the evidence of defendants showed that under the city's prevailing wage scale a city employe performing work of the same character as such a serviceman would receive compensation of $162.15 per month, or $972.90 for the six-month trial period, we think that the variance involves more than the sum mentioned. The undisputed evidence shows that the market cost of such service was at least $2 per meter and that contractors, the same as the other bidders did here, include in their bids as a matter of course at least that amount. That is what the city lost in money by the variance, because the loss was not what it would have to pay a city employe to do the work, but what it would cost to have a contractor do it. The amount would be over $2,100 for all the meters. To begin with, we think the sum, whether we take it to be $972.90 or $2,100, is substantial. But, in addition to the amount involved, by excepting the rendition of the service from its bid, Dual attempted to relieve itself of responsibility for the working condition of the meters at the end of the trial period and to shift that responsibility to the city. In Le Tourneau v. Hugo, 90 Minn. 420, 424-425, 97 N. W. 115, 117, *supra,* it was held that modifying a

provision in the plans and specifications in letting the contract so as to shorten the test period for an aerial bridge from three months to one and so as to provide for payment of part of the purchase price upon the contractor's furnishing a bond for satisfactory performance created a material variance between the contract and the city's specifications which voided the contract. We said that consent by the city to the variance constituted the relinquishment of a substantial right by the city. A requirement that a contractor service a mechanism installed by him during the test period allowed by the contract involves a substantial right. Here, because that is true, Dual's bid varied materially from the city's specifications, because it excepted therefrom the furnishing and compensating of a serviceman to service the meters during the test period.

■ After bids have been received and opened, no material change may be made in any bid. City of Chicago v. Mohr, 216 Ill. 320, 74 N. E. 1056; Urbany v. City of Carroll, 176 Iowa 217, 157 N. W. 852, *supra;* 3 McQuillin, Municipal Corporations (Rev. 2 ed.) § 1325; 43 Am. Jur., Public Works and Contracts, § 46. Hence, it was not permissible here for the city to permit Dual to modify its bid so as to include therein proposals to install the meters according to the city's method and to furnish the serviceman to service the meters during the trial period. Such modifications amounted to negotiation of the contract in disregard of the requirements of competitive bidding. Louchheim v. Philadelphia, 218 Pa. 100, 66 A. 1121.

But Dual urges that making such modifications relates to mere details of letting the contract, with respect to which the city authorities have discretion unrestricted and unimpaired by the requirements of the charter relative to competitive bidding. We cannot agree with the contention. The very purpose of requiring competitive bidding is to divest the officials having the power to let contracts of discretion in some respects and to limit its exercise in others. In the area of discretion is precisely where such abuses as fraud, favoritism, extravagance, and improvidence in connection with the letting of contracts are prevalent. Ordinary legal remedies are inadequate to correct resulting wrongs. The purposes of require-

ments for competitive bidding are to prevent such abuses by eliminating opportunities for committing them and to promote honesty, economy, and aboveboard dealing in the letting of public contracts. The requirements are said to have been born of "distrust" of public officers whose duty it is to make public contracts. Molloy v. City of New Rochelle, 198 N. Y. 402, 92 N. E. 94, 30 L.R.A.(N.S.) 126; 43 Am. Jur., Public Works and Contracts, § 26. See, Diamond v. City of Mankato, 89 Minn. 48, 93 N. W. 911, 61 L. R. A. 448, *supra.* Because that is true, the rule is as stated in the text just cited:

"Since they are based upon public economy and are of great importance to the taxpayers, laws requiring competitive bidding as a condition precedent to the letting of public contracts ought not to be frittered away by exceptions, but, on the contrary, should receive a construction always which will fully, fairly, and reasonably effectuate and advance their true intent and purpose, and which will avoid the likelihood of their being circumvented, evaded, or defeated. Stern insistence upon positive obedience to such provisions is necessary to maintain the policy which they uphold. Contracts made in defiance of such requirements not only are unenforceable, but afford no basis for recovery by the contractor upon an implied obligation to pay the value of benefits received by the public body."

If officials charged with the letting of public contracts should be permitted in their discretion to permit bids to be changed after they have been received and opened, it would open the door to the abuses which it is the purpose of the requirements of competitive bidding to prevent and suppress.

Dual contends that in Rice v. City of St. Paul, 208 Minn. 509, 295 N. W. 529, and Interstate Power Co. v. Fairbanks, Morse & Co. 194 Minn. 110, 259 N. W. 691, we sustained variances which in principle are the same as those here complained of. In the Rice case (208 Minn. 522, 295 N. W. 535), we held that where bidders were required to state in detail the terms of payment for voting machines to be purchased on an installment payment basis, a bid showing the amount of the equalized installment payments and interest separate-

ly did not vary from the plans and specifications, because the price bid was shown as required by the plans and specifications and the separate itemization of the interest "could do no more than to disclose to the city the basis upon which the annual payments were founded." We there reaffirmed the rule of City of Bemidji v. Ervin, 204 Minn. 90, 282 N. W. 683, *supra.* In the Interstate Power case, we held that inserting in a bid for furnishing equipment for a municipal electric plant a provision, not in the specifications, to the effect that the village there involved should institute proceedings to remove competition from a privately owned utility company using the village streets, whose franchise was about to expire, did not constitute a variance, because such a provision included only what the village was legally obligated to do anyway. The alleged variances in the Rice and Interstate Power cases did not change the legal effect of the bids. The rule that a bid must conform to the invitation to bid is like the one that an acceptance must conform to the offer of a contract. Northeastern Const. Co. v. City of Winston-Salem (4 Cir.) 83 F. (2d) 57, 104 A. L. R. 1142. See, Smith v. Independent School Dist. 108 Minn. 322, 122 N. W. 173; Noce v. Edward E. Morgan Co. Inc. (8 Cir.) 106 F. (2d) 746. There can be no variance in either case. In such cases, the same as we held in the Rice and Interstate Power cases, explicit statement in a bid of terms not expressly stated in the specifications on which bids were invited, but which would be implied as a matter of law or of fact, does not constitute a variance. See, 1 Williston, Contracts (Rev. ed.) § 78.

There has been no showing or suggestion here of fraud or wrongdoing, but only a failure on the part of the city officials to observe the requirements of the charter as to competitive bidding. It is not necessary to show fraud or such other wrongdoing. Failure to comply with requirements of the charter as to competitive bidding compels decision that the bid, the attempted modification of it, and the award of the contract on the bid as modified were void. To hold otherwise would "emasculate," as we said in Diamond v. City of Mankato, 89 Minn. 48, 53, 93 N. W. 911, 913, 61 L. R. A. 448, *supra,* the charter requirements for competitive bidding.

Our conclusion is that Dual's bid was a proposal to install the meters according to its own specifications as a substitute for the method required by those of the city; that, because its bid was such a proposal and because it excepted therefrom the requirement of furnishing and compensating a serviceman to service the meters during the trial period, the bid varied from the city's specifications in material and substantial respects; that its bid should have been rejected; and that the city was without authority to permit Dual to amend and modify its bid in the respects mentioned after the bids had been received and opened. For these reasons, plaintiff was entitled to judgment nullifying the award of the contract to Dual and granting an injunction enjoining the city and Dual from entering into and performing a contract pursuant to the award.

Reversed with directions to enter judgment nullifying the award of the contract to Dual and granting an injunction enjoining the city and Dual from entering into and performing a contract pursuant to the award.

