HENRY T. CLAUS, CAESAR A. GRASSELLI, R. RIGGS GRIFFITH, IV, and J. B. S. HOLMES,
Plaintiffs,

*vs.*

JOHN E. BABIARZ, Mayor of the City of Wilmington, WILLIAM J. McCLAFFERTY, JR., GEORGE A. MELLON, JR., CHARLES PROTACK, DANIEL J. PAOLINO, WILLIAM H. BURTON, MARCELLO RISPOLI, MAURICE ROUSELLE, JR., WALTER J. BRADY, JOSEPH L. WALLACE, SAMUEL G. ALBERT, GEORGE F. SCHLOR, JOSEPH F. NOVAK, JOSEPH A. MARTIN, Members of The Council of the City of Wilmington, PAUL E. SHOCKLEY, Clerk of The Council, JOSEPH M. KWIATKOWSKI, City Solicitor, the Mayor and Council of Wilmington, a Municipal Corporation of the State of Delaware, and METROPOLITAN ASSOCIATES, INC., a Corporation of the State of Delaware,
Defendants.

*New Castle, November 7, 1962.*

*Rodney M. Layton* and *Max S. Bell, Jr.,* of Richards, Layton & Finger, Wilmington, for plaintiffs.

*Joseph M. Kwiatkowski* and *James M. Mulligan, Jr.,* Wilmington, for Mayor and Council of Wilmington and certain individual defendants.

*Norman N. Aerenson* and *Sidney Balick,* Wilmington, for Metropolitan Associates, Inc.

SHORT, Vice Chancellor: This is a taxpayer's action which seeks to enjoin the sale of property owned by the City of Wilmington in the 800 block, Delaware Avenue to defendant, Metropolitan Associates, Inc. (hereinafter Metropolitan) for the sum of $100,000. The property involved, known as the former Wilmington High School property, ceased to be used for school purposes in 1958. On April 6, 1961 the Board of Public Education in Wilmington, an administrative agency having control and jurisdiction over said property, passed a resolution declaring the property to be no longer required for school purposes and authorized preparations for the transfer thereof to the Mayor and Council of Wilmington. By act of the General Assembly of the State of Delaware, approved May 3, 1961 the Mayor and

Council of Wilmington were authorized to adopt procedure for the sale and disposal of surplus land and property. Pursuant to said act, on June 22, 1961, the Council adopted Ordinance 61–017 establishing the procedure for disposal of surplus property. This ordinance was approved by the Mayor on June 26. On June 29, 1961 the Council passed Resolution 61–050 declaring the property involved surplus and referred the matter to the Wilmington Planning Commission for its recommendations "as to the best use or uses of said premises." On August 10, 1961 written recommendations, dated August 1, were made to the Mayor and Council by the Wilmington Planning Commission as to the best use or uses to be made of the premises. On August 17, 1961 the Council passed Resolution 61–070 authorizing the clerk to advertise the property in accordance with the Wilmington Planning Commission's report. This resolution also provided that any bids received should be reviewed by the Planning Commission which should make its recommendations "as to which bid is considered most consistent with the best future use of the property." It further provided that "the bids, together with the Planning Commission's recommendations, if any, shall be submitted to 'The Council' which, by Resolution, shall approve the bid of the best bidder, or may reject any and all bids." On August 25, 1961 the Board of Public Education in Wilmington executed and delivered its deed conveying to the Mayor and Council of Wilmington the property involved.

Pursuant to the authorization in Resolution 61–070 the Clerk of the Council prepared a form of advertisement for newspaper publication. The material provisions of this form were as follows:

"NOTICE OF SALE OR LEASE OF SURPLUS PROPERTY
BY
THE MAYOR AND COUNCIL OF WILMINGTON

"PUBLIC NOTICE is hereby given that the Clerk of 'The Council' of the City of Wilmington will receive, publicly open and read aloud sealed bids from qualified bidders for the purchase or lease and future use of the property occupied by the former Wilmington High School at Delaware Avenue and Adams Street, and more particularly described herein, on October 30, 1961, at 10 A.M. E.S.T., in his office at Room 368, City Hall, Wilmington, Delaware.

\* \* \* \* \* \*

## "DESCRIPTION OF THE PROPERTY

\* \* \* \* \* \*

## "TERMS OF SALE OR LEASE

"Sale shall be on the basis of not less than one-third cash, the balance to be paid within three years at six per cent interest payable semi-annually, secured by a first mortgage. Lease shall be for a minimum term of 20 years.

## "CONDITIONS AND RESTRICTIONS

"The sale shall be subject to the following conditions and restrictions, which will be incorporated in the deed to the purchaser:

"(a) There shall be a minimum setback of 20 feet from the property line along Delaware Avenue.

"(b) Not more than 50 per cent of the total lot area shall be used for building purposes.

"(c) All parking and loading required for future use of the premises shall be accommodated on site.

"(d) The existing buildings on the premises must be demolished.

"(e) If any of the foregoing conditions are violated. The Mayor and Council reserves the right to cancel the deed to the purchaser and/or direct the purchaser to deed the property back to The Mayor and Council. Specific performance shall be available as a remedy.

## "CONTENTS OF BID

"Bids shall contain:

"(a) Name and address of bidder and a brief statement of bidder's qualifications.

"(b) Statement of terms of proposed purchase or lease. Bidder may submit a bid setting forth alternatively terms for either purchase or lease.

"(c) Description of proposed future use of property in as much detail as possible, including plans, drawings, etc. if possible.

"(d) Estimated time from date of purchase until property shall be put to its proposed future use, and estimated progress schedule in converting to proposed use.

## "AWARD OF CONTRACT

" 'The Council' intends to consider the nature and promptness of the proposed future use as well as the bid price and reserves the right to award the contract for sale to the bidder whose proposed future use is most consistent with overall urban renewal planning 'The Council' reserves the right to reject any or all proposals, or to accept any proposal, and/or to waive technicalities when in its judgment it is in the best interest of the City of Wilmington.

## "RECOMMENDED FUTURE USES AND ADDITIONAL INFORMATION

"Additional information and recommended future uses for the property are contained in a report of the Wilmington Planning Commission to 'The Council' dated August 1, 1961. This report is available at the office of the Clerk of 'The Council,' and should be consulted by prospective bidders since 'The Council' will be guided by the recommendations of the Planning Commission contained in this report in awarding the contract of sale.

"/s/ PAUL SHOCKLEY
"Clerk of 'The Council.' "

This notice was published in the Evening Journal, a daily newspaper printed and published in the City of Wilmington, in its issues of September 27, October 4 and October 11, 1961. An abbreviated notice was published in the Philadelphia Inquirer in its issue of October 1, 1961 and in the Wall Street Journal in its issue of October 3, 1961.

On October 30, the Clerk of the Council received two bids. One of these was the offer of Metropolitan Associates, Inc. for the purchase of the property. The other was the offer of Aims, Incorporated, for a long term lease of the property. The Metropolitan proposal offered the sum of $100,000 for the purchase of the subject property and provided: "Our offer and proposal is conditioned upon the rezoning of

this property to C–3 or whatever zoning may be necessary for the construction of a motor hotel. Our offer and proposal is further conditioned upon the vacation of that portion of Monroe Street presently located on the said premises. Our offer and proposal is further conditioned upon non-interference by the proposed FAI–2 Freeway Ramp with our means of access and egress to the motor hotel on Delaware Avenue."

The bids received were delivered to the Wilmington Planning Commission for its appraisal and recommendations. On November 30 the Wilmington Planning Commission made its report to the Mayor and Council. This report analyzed the proposals of the respective bidders, stated that the Metropolitan bid was incomplete in certain particulars and contained alternative recommendations. On the same date the Council passed Resolution 61–103 providing that Metropolitan "submit a draft or a proposed agreement of sale to the City Solicitor, which agreement should set forth and clarify the completion date, construction progress schedule on the proposed motel, zoning requirements, restrictions, conditions, and any and all other limitations effecting the aforesaid parcel of land. FURTHER RESOLVED that upon the City Solicitor approving the aforesaid agreement of sale plans for settlement be scheduled between the interested parties and the Mayor of the City of Wilmington and the Clerk of 'The Council' be and they are hereby authorized and directed to execute an agreement of sale and a deed in order to accomplish and effectuate the sale and transfer" of the premises.

Pursuant to the provisions of Resolution 61–103 Metropolitan prepared and submitted to the City Solicitor a proposed agreement of Sale. Paragraph 4 of the proposed agreement provides: "4. *Zoning.* Seller shall insure proper zoning of the site to permit the construction of the motor hotel. Seller shall also insure that in the event Monroe Street has not been vacated, said street will be vacated and the bed thereof become an integral part of the site."

Paragraph 5 of the proposed agreement provides: "5. *Access and Egress to Premises.* Buyer shall have the privilege of voiding this agreement in the event exit and/or entrance ramps to FAI–2, the

Freeway through the West side of Wilmington, interefere with, or deny access or egress to and from the aforesaid site."

Other provisions of the proposed agreement provided for avoidance thereof upon the happening of certain contingencies beyond Metropolitan's control. The testimony discloses that the City Solicitor considered the provisions of the proposed agreement and conferred with Metropolitan's attorney with respect thereto. It is evident that these attorneys were in agreement with respect to some of the terms proposed by Metropolitan but were in disagreement as to other terms.

The record shows that defendant Brady, one of the councilmen, voted against Resolution 61–103, and that said defendant, at a council meeting on December 14, 1961, moved to rescind Resolution 61–103. Defendant Albert joined defendant Brady in voting for the motion. The remaining councilmen voted against it. Since these defendants, as plaintiffs say, "voted against making the sale to Metropolitan," plaintiffs have abandoned any claim for relief against Brady and Albert individually and have agreed to the entry of judgment in their favor.

On December 20, 1961, at plaintiffs' instance, Harry R. Brown, a real estate appraiser, made an appraisal of the subject property. He appraised it to be of the value of $225,000 plus demolition costs. This action was commenced on the same day.

The facts as stated sufficiently show the general picture made by the record. There are many details which it would be necessary to recite if the court was called upon to determine all of the issues which plaintiffs raise. Plaintiffs point to many matters of procedure which they contend were violative of statutory and ordinance provisions and resulted in stifling competition in the bidding. They argue that the Metropolitan bid could not be legally accepted by the Council because Metropolitan did not have corporate existence on October 30, 1961 when its bid was submitted. They contend that the sale to Metropolitan as proposed in Resolution 61–103 would be for a grossly inadequate consideration and that the sale must therefore be enjoined. Plaintiffs also complain that Metropolitan's bid was not responsive to the invitation to bid in that it was conditional and at variance with the pro-

posal in certain material respects. Since I am satisfied that this latter complaint is meritorious and requires the entry of an order enjoining the sale to Metropolitan, it is unnecessary to consider the other issues upon which plaintiffs rely.

It is the general rule that a bid must conform substantially to the advertised plans and specifications, and where there is a failure to comply substantially with the terms of the proposal it is the duty of public authorities to reject the bid. *Bader v. Sharp,* 36 *Del.Ch.* 89, 125 *A.2d* 499; 43 *Am.Jur.* § 40; *Coller v. City of St. Paul,* 223 *Minn.* 376, 26 *N.W.2d* 835. Whether or not there is a material variance "is determined largely with reference to whether the bidder's proposal gives him an advantage or benefit which is not enjoyed by other bidders." 43 *Am.Jur.* § 40. It is a question of fact, to be resolved in the light of all the circumstances. *Bader v. Sharp, supra.* Nor does it matter in considering the materiality of a bidding variance whether there is only one or several bidders. *Coller v. City of St. Paul, supra.*

The circumstances of the present case clearly indicate a material variance in one or more respects. As heretofore observed Metropolitan's bid was subject to three conditions, namely, (1) rezoning of the property to permit construction of a motor hotel, (2) the vacation of a portion of Monroe Street, and (3) non-interference by the ramps of the proposed Freeway with means of access and egress to the property.

As I am of the opinion that the condition of non-interference by the Freeway ramps is clearly a material variance from the proposal, consideration need not be given to the materiality of the conditions relating to zoning and the vacation of a portion of Monroe Street. The effect of the condition of non-interference in Metropolitan's bid is to provide an avoidance of the bid upon the happening of a contingency which is in the control of neither the Mayor and Council of Wilmington or Metropolitan. As I read the city's proposal, it calls for the submission of bids for the purchase of the subject property for such use as may be agreeable to the Council. The only conditions to which the sale is subject are those mentioned under the title "CONDITIONS AND RESTRICTIONS." Metropolitan calls

attention to paragraph (b) under the title "CONTENTS OF BID." This paragraph provides that bids shall contain a "statement of terms of proposed purchase." Metropolitan says that this, as well as the other conditions contained in its bid, is merely a term of the proposed purchase. But it is obvious that the phrase mentioned has reference to the "basis" of the sale as provided by the "TERMS OF SALE OR LEASE" of the proposal. By the latter provisions bidders were privileged to name the *terms of payment* within certain limitations. Metropolitan did, in fact, name these terms in its bid. The contention is without merit. Moreover, in the bid the limitation is referred to as a condition, the happening of which will avoid the bid. That this is contrary to the proposal is recognized by the City Solicitor who testified that he "certainly did not agree to this condition at all." And at oral argument, in response to a question by the court, the Assistant City Solicitor stated that the condition was not acceptable to the city. On the other hand, it is clear that if this condition is not contained in the final agreement of purchase the agreement will not be acceptable to Metropolitan. Henry L. Weinstein, President of Metropolitan testified that if the three conditions "were not met" the bid could not "be carried through." It is, therefore, apparent that the parties themselves regard this condition as material. In the light of the circumstances involved I find that it is also a substantial and material variance from the terms of the proposal. It was, therefore, the duty of the Council to reject the Metropolitan bid. 43 *Am.Jur.* § 40.

Plaintiffs contend that the record establishes that the Mayor and councilmen have individually committed breaches of trust in the circumstances leading up to the acceptance of bids and the consideration of bids received. Plaintiffs, therefore, say that the Mayor and individual councilmen should be held accountable for any loss suffered by the city as a result of such breaches of trust. They contend also that in the circumstances the court should assess all costs, including their counsel fees, upon the Mayor and individual councilmen. The record does not establish any bad faith on the part of any of the defendants. Though it may be properly said that a more strict adherence to established procedure than was followed in the attempted disposal of the subject property is desirable, I am satisfied that the actions of the Mayor and councilmen were not such as to warrant the

court's holding them individually responsible for any losses which the city has incurred. I decline to so order.

Plaintiffs' application for the assessment of counsel fees against the Mayor and individual defendants must also be denied. There is no precedent in this state for the allowance of fees under the circumstances presented, and, since plaintiffs have failed to show bad faith, I do not regard the case as a proper one for the assessment of fees.

The costs of this proceeding are taxed against the Mayor and Council of Wilmington, a municipal corporation.

Plaintiffs are entitled to judgment nullifying the sale to Metropolitan and enjoining The Mayor and Council of Wilmington and Metropolitan from entering into and performing a contract pursuant to the award.

Order on notice.