## VILLAGE OF EXCELSIOR v. F. W. PEARCE CORPORATION.

226 N. W. 2d 316.

February 14, 1975—No. 44618.

*Grathwol, Ploetz, Oberhauser & Nodland* and *James N. Grathwol,* for appellant.

*Kelly & Larson* and *Gary Larson,* for respondent.

Heard before Peterson, Todd, and Scott, JJ., and considered and decided by the court en banc.

SCOTT, JUSTICE.

This action is considered by this court pursuant to a notice of review filed by respondent, F. W. Pearce Corporation, of an order of the Hennepin County District Court denying its motion for a new trial.

The village of Excelsior levied special assessments against property owned by Pearce for the construction of a sewer known as the Boatworks Project. Upon appeal, the district court found that the village had complied with regular statutory procedures in levying the assessments, but ordered that, since one of the assessments exceeded the value of the special benefits to one of the parcels owned by Pearce, that parcel should be reassessed. We affirm.

Motions for a new trial were filed by both the village of Excelsior and Pearce; the former upon the issue of the value of special benefits and the latter with regard to the propriety of the bidding procedures utilized by the village in letting the contract. Both motions were denied.

The village appealed to this court and subsequently voluntarily

dismissed the appeal over the objections of Pearce. The precise issue thus before the court upon the notice of review filed by Pearce is whether the village complied with the contract bidding procedures established in Minn. St. 429.041 in the construction of the sanitary sewer improvement.

On June 23, 1970, the village council of Excelsior adopted a resolution to order a preliminary report on a sanitary sewer improvement called the Boatworks Project. The report submitted on July 23, 1970, recommended, in an effort to assure maximum economy, that the project be coordinated with one under consideration by the Metropolitan Sewer Board (Metro).

On November 18, 1970, Metro advertised for bids on its sanitary sewer project, referred to as Shorewood II, which was to be constructed in an area including Excelsior. The Shorewood II plans did not include the Boatworks Project, and bids received December 22, 1970, did not include that project nor was there in effect an existing contract or agreement between Metro and the village for joint construction. A bid was accepted and a unit contract let by Metro for Shorewood II on January 6, 1971.

A subsequent preliminary report was filed with the Excelsior village council in March, 1971. This report estimated the total cost of the Boatworks Project at approximately $19,900. Pearce voiced its objection to the project at a public hearing held by the village to consider the improvement. On April 26, 1971, the village council ordered the installation of the Boatworks sewer and further authorized Metro to construct it at its unit contract price.

Pursuant to this authorization, Metro issued a change order to the existing Shorewood II contract to allow construction of the Boatworks Project. Upon completion of the construction of the Boatworks Project, it was determined that its total cost was $27,894.95. Assessments were made in the amount of $25,500, of which $15,000 was specially assessed against the Pearce property, after a public hearing and over the objections of Pearce that statutory bidding requirements of advertising had not been satisfied.

Minn. St. 429.041, the construction of which presents the sole issue for our determination, provides in pertinent part:

"Subdivision 1. When the council determines to make any improvement, it shall cause plans and specifications of the improvement to be made, or if previously made, to be modified, if necessary, and to be approved and filed with the clerk, and if the estimated cost exceeds $5,000, shall advertise for bids for the improvement in the newspaper and such other papers and for such length of time as it may deem advisable. If the estimated cost exceeds $100,000, publication shall be made once in the newspaper and at least once in a newspaper or trade paper published in a city of the first class no less than three weeks before the last day for submission of bids. * * * Nothing herein shall prevent the council from advertising separately for various portions of the work involved in an improvement, or from itself, supplying by such means as may be otherwise authorized by law, all or any part of the materials, supplies, or equipment to be used in the improvement or from combining two or more improvements in a single set of plans and specifications or a single contract.

"Subd. 2. In contracting for an improvement, the council shall require the execution of one or more written contracts and bonds, conditioned as required by law. The council shall award the contract to the lowest responsible bidder or it may reject all bids. * * *

* * * * *

"Subd. 5. When an improvement is made under a cooperative agreement with the state or another political subdivision by the terms of which the state or other subdivision is to construct or contract to construct the improvement, it shall not be necessary to comply with subdivisions 1 and 2.

* * * * *

"Subd. 7. After work has been commenced on an improvement undertaken pursuant to a contract awarded on a unit price basis the council may, without advertising for bids, authorize

changes in the contract so as to include additional units of work at the same unit price if the cost of the additional work does not exceed 25 percent of the original contract price. Original contract price means that figure determined by multiplying the estimated number of units required by the unit price."

Generally, the object of statutory bidding requirements in connection with the letting of municipal contracts is to prevent fraud, collusion, favoritism, and improvidence in the administration of public business, as well as to insure that the municipality receives high-quality labor and supplies at the most reasonable prices. 10 McQuillin, Municipal Corporations (3 ed.) § 29.29; Antieau, 1A Municipal Corporation Law, § 10.26; Blum v. City of Hillsboro, 49 Wis. 2d 667, 183 N. W. 2d 47 (1971).

In construing public bidding rules as mandatory, this court has supported the policy of holding that failure to comply will invalidate a public contract. Coller v. City of St. Paul, 223 Minn. 376, 26 N. W. 2d 835 (1947); Casey v. Central Elec. & Tel. Co. 202 Minn. 510, 279 N. W. 263 (1938); Fargo Foundry Co. v. Village of Callaway, 148 Minn. 273, 181 N. W. 584 (1921). See, also, Spencer, *The New Assessment-Improvement Procedure*, 38 Minn. L. Rev. 582, 590.

Pearce essentially contends that the village, by its failure to advertise for bids for this particular improvement, is attempting to circumvent the purpose of the statute by merely "tacking on" to an existing contract. It therefore asserts that the village did not comply with Minn. St. 429.041, subds. 1 and 2.

Minn. St. 429.041 is initially rather specific in setting forth the procedural guidelines to be met before a public contract is let and attempts to protect the public interest, as discussed above. The statute specifically mandates, in subd. 1, public advertisement for bids for the contract. Further, it is obvious that this mandatory language would permit no discretionary decision to avoid such action unless an improvement project should possess additional characteristics to bring it within the exceptions created by subd. 5 and subd. 7.

The village of Excelsior maintains that its "cooperative agreement" with the Metropolitan Sewer Board is sufficient to bring this project within the purview of subd. 5, in that Metro had complied with statutory bidding procedures. Minn. St. 473C.16. Pearce contends that, despite this compliance by Metro, to allow this "tacking on" to an existing contract would not only perpetuate the evils which the statute attempts to avoid, but would perhaps facilitate a situation of "municipal contract shopping" by a public body not interested in following the time-consuming requirements of public advertising.

We are unable to construe subd. 5 as the village advocates in seeking approval of its actions. Rather, it appears that subd. 5 was enacted to govern situations in which two or more political subdivisions agree, prior to the advertisement for bids on any portion of a project, to cooperate in constructing particular improvements. In such cases, it would be time-consuming and unnecessary to require multiple procedural compliance for what is essentially the same project. In the instant case, although it is reasonable to assume that there is no invalidity to the Metro contract, the Boatworks Project was not even approved by the Excelsior village council prior to the time Metro advertised for bids. We are, therefore, of the opinion that this is not strict compliance within the intent of the statute. Despite the fact that attendant bidding procedures did protect the public, those procedures were not for the Boatworks Project, which, for purposes of the statute, is the improvement contemplated.

Minn. St. 429.041, subd. 7, provides the language to aid in our determination, in that it would allow a modification of a contract as occurred here. The prerequisites allowing a proper invocation of this subsection have been satisfied in that the Metro sewer project was commenced prior to the requested modification; the contract was let on a unit basis; and the modification or addition did not exceed 25 percent of the original contract price. Therefore, the intent of the statute has been satisfied under subd. 7. When two municipal bodies have substantially similar goals to-

ward improvement of structures and facilities within their control, the primary concern should be that the unit price contract be executed in a fair and conscientious manner. The legislature contemplated that estimates may not always accurately reflect the total costs of a completed project and therefore provided that additions up to a maximum of 25 percent could be made without requiring bidding procedures for such additions.

We conclude, then, that where a unit price contract is advertised and bid for, and subsequent additions are made in volume only, it cannot be unjust to merely amend the contract. The variable in the contract is the total estimated number of units and the constant is the unit price. Therefore, no harm results from amending a factor which is necessarily subject to change under many different circumstances. The harm we should seek to protect against is an unreasonable unit price, and that factor is not a proper subject of the contract modification.

We conclude that the procedure followed by the Excelsior village council, though not proper when standing alone, receives its validity from the Metro improvement project already in existence. The decision of the district court, which found that the admittedly irregular procedure utilized here was statutorily permissible, is therefore affirmed.

Affirmed.