Scott SAYER, et al., Appellants,

v.

**MINNESOTA DEPARTMENT OF TRANSPORTATION, Respondent,**

**Flatiron–Manson, Respondent.**

Nos. A08–1584, A08–1994.

Supreme Court of Minnesota.

Oct. 28, 2010.

---

Dean B. Thomson, Jeffrey A. Wieland, Fabyanske, Westra, Hart & Thomson, P.A., Minneapolis, MN, for appellants.

Lori Swanson, Attorney General, Richard L. Varco, Jr., Assistant Attorney General, St. Paul, MN, for respondent Minnesota Department of Transportation.

Thomas J. Vollbrecht, Faegre & Benson, LLP, Minneapolis, MN, for respondent Flatiron–Manson.

Robert J. Huber, Leonard, Street and Deinard, P.A., Minneapolis, Minnesota, for amicus curiae Associated General Contractors of Minnesota.

## OPINION

PAGE, Justice.

On August 1, 2007, the Interstate 35W (I–35W) highway bridge spanning the Mississippi River in Minneapolis collapsed killing 13 people and injuring many others. To replace the bridge, one of the most heavily traveled in the state, respondent Minnesota Department of Transportation (MnDOT) elected to use the relatively new design-build best-value bidding process to choose the new bridge's design and con-

tractor. *See* Minn.Stat. §§ 161.3410–.3428 (2008). Respondent Flatiron–Manson was declared the winning bidder and its proposal to rebuild the bridge was accepted. Appellants Scott Sayer and Wendell Phillippi brought an action as private attorneys general under Minn.Stat. § 8.31, subd. 3a (2008), challenging the bidding process and claiming that MnDOT's contract with Flatiron–Manson was illegal. Specifically, appellants claim that MnDOT failed to apply the proper test for responsiveness and that Flatiron–Manson's proposal was not responsive to the request for proposals (RFP) and instructions to proposers issued by MnDOT. The district court concluded that the common law definition of "responsiveness" does not apply to the design-build best-value bidding process and that the determination of the Technical Review Committee that Flatiron–Manson's proposal was responsive was within the Technical Review Committee's discretion. The court of appeals affirmed. Because we conclude that Flatiron–Manson's bid was responsive to the RFP and the instructions to proposers, we affirm.

Three days after the I–35W bridge collapse, MnDOT began the process of replacing the bridge. MnDOT's Commissioner elected to evaluate proposals for the bridge-construction contract using a design-build best-value procurement process instead of the traditional lowest responsible bidder procurement process. As required by the design-build best-value procurement process, the Commissioner issued a request for qualifications to contractors interested in undertaking the design and construction of the bridge. *See* Minn.Stat. § 161.3420, subd. 3. After five qualifying contractors were identified, the Commissioner sent each qualifying contractor an identical RFP containing detailed project-specific requirements. *See* Minn.Stat. § 161.3422. The Commissioner subsequently issued instructions to propo-

sers that described the weighted criteria by which proposals would be evaluated, and informed bidders that only bids meeting the standards established by MnDOT would be evaluated. *See* Minn.Stat. § 161.3422(2). The Commissioner appointed a six-member Technical Review Committee to evaluate the proposals. *See* Minn.Stat. § 161.3420, subd. 2.

Four contractors—C.S. McCrossan, Ames–Lunda, Flatiron–Manson, and Walsh–American Bridge—submitted proposals to MnDOT. After reviewing the proposals, the Technical Review Committee submitted to the Commissioner the technical scores it assigned to each proposal. The technical scores were accompanied by an itemized list of each proposal's score on the categories described in the instructions to proposers, with detailed comments for each score. Flatiron–Manson's proposal received the highest technical score: 91.47 out of 100 possible points. The next highest score, 67.88 out of 100, was awarded to Walsh–American Bridge's proposal. MnDOT determined the adjusted scores for the proposals by applying the formula set out in Minn.Stat. § 161.3426, subd. 1(c), which in this case required it to multiply the number of days proposed to complete the project by a "Road User Cost" of $200,000 per day, add that product to the contractor's bid, and divide the result by the proposal's technical score. Although Flatiron–Manson had the highest price and was tied with another bidder for the longest period needed to complete the construction of the bridge, its high technical score yielded the lowest adjusted score, constituting the "best value"; thus, Flatiron–Manson was awarded the contract.

Appellants sued, seeking both injunctive and declaratory relief based on their claim that Flatiron–Manson's proposal was not responsive to the RFP and instructions to proposers and should have been rejected,

and therefore the contract awarded to Flatiron–Manson was illegal. According to appellants, Flatiron–Manson's proposal was not responsive to the RFP because it failed to comply with a number of the RFP's specifications, only two of which are at issue before us: first, that "[p]roposed work for this project shall not include additional capacity or Right of Way" and, second, that concrete-box designs feature "[a] minimum of three webs."

Appellants first moved for a temporary restraining order on October 31, 2007, which the district court denied.[1] On July 16, 2008, appellants moved for a temporary injunction to prevent MnDOT from incurring additional costs or expenses under the contract while their claims were being litigated. On that same date, Flatiron–Manson moved for summary judgment seeking denial of appellants' claims for injunctive relief and dismissal of appellants' claims for declaratory relief. In separate orders, the district court denied appellants' motions for injunctive and declaratory relief and granted summary judgment to MnDOT and Flatiron–Manson, dismissing appellants' claims for declaratory relief. In doing so, the district court rejected appellants' argument that the Technical Review Committee should have used the traditional common law definition of "responsive" to evaluate Flatiron–Manson's proposal. Instead, the district court concluded that, under the design-build best-value procurement process, whether a proposal is responsive to the RFP "is a product of the scoring methodology" rather than the "proposal's strict conformity with each and every requirement of the RFP."

Appellants' separate appeals from the district court's orders were consolidated at the court of appeals, which affirmed. The court of appeals held that the common law definition of "responsiveness" does not apply to the design-build best-value procurement process and that the Technical Review Committee acted within its discretion when it determined that Flatiron–Manson's proposal was responsive. *Sayer v. Minn. Dep't of Transp.*, 769 N.W.2d 305, 310–11 (Minn.App.2009). We granted appellants' petition for review.

■ "On appeal from a grant of summary judgment, we must determine whether any genuine issues of material fact exist and whether the district court erred in its application of the law." *Patterson v. Wu Family Corp.*, 608 N.W.2d 863, 866 (Minn.2000). When there are no disputed issues of material fact, we review de novo whether the district court erred in its application of the law. *Kelly v. State Farm Mut. Auto. Ins. Co.*, 666 N.W.2d 328, 330 (Minn.2003).

■ Traditionally, Minnesota public construction contracts have been awarded using the lowest responsible bidder approach to procurement. Dean B. Thomson, et al., *A Critique of Best Value Contracting in Minnesota*, 34 Wm. Mitchell L.Rev. 25, 26 (2007); *see also Foley Bros., Inc. v. Marshall*, 266 Minn. 259, 262, 123 N.W.2d 387, 389–90 (1963); *Griswold v. Ramsey Cnty.*, 242 Minn. 529, 533, 65 N.W.2d 647, 650 (1954); *Coller v. City of Saint.Paul*, 223 Minn. 376, 378, 26 N.W.2d 835, 836–37 (1947). That approach requires a public agency to choose a design

---

1. Appellants appealed to the court of appeals from the denial of the temporary restraining order, petitioned the court of appeals to expedite the appeal, and simultaneously petitioned for accelerated review (and for expedited consideration of the petition for accelerated review) by our court. *Sayer v. Minn. Dep't of Transp.*, Case No. A07-2118. We granted the motion for expedited consideration of the petition for accelerated review but ultimately denied accelerated review. After the court of appeals denied appellants' petition for expedited appeal, the parties stipulated to dismissal of the appeal before the court of appeals without prejudice.

and release specifications for that design to contractors for bidding. Minn.Stat. § 161.32, subd. 1b (2008); *Coller*, 223 Minn. at 378, 26 N.W.2d at 837. When the time for submitting bids expires, the agency then eliminates all bids from contractors that do not qualify due to a material variation from the given specifications. *Foley Bros., Inc.*, 266 Minn. at 263, 123 N.W.2d at 390; *Coller*, 223 Minn. at 385, 26 N.W.2d at 840. Of the remaining bids, the agency awards the contract to the qualified contractor with the lowest bid. *Coller*, 223 Minn. at 385, 26 N.W.2d at 840.

■ The Legislature has been cautious of giving agencies substantial discretion in contracting for public works to avoid "such abuses as fraud, favoritism, extravagance, and improvidence in connection with the letting of contracts." *Coller*, 223 Minn. at 387, 26 N.W.2d at 841. Requiring officials to reject nonresponsive proposals eliminates opportunities for committing such abuses and promotes honesty, economy, and above-board dealing in the letting of public contracts. *Id.* at 387, 26 N.W.2d at 841. After receiving bids, the only function of the contracting agency, under traditional contracting principles, is "to determine who is the lowest responsible bidder." *Coller*, 223 Minn. at 385, 26 N.W.2d at 840. A traditional approach bid is a definite offer to contract that can be accepted without further negotiations, but it must conform substantially to the advertised plan and specifications. *Id.* at 385, 26 N.W.2d at 840. A variance between the bid and the advertised plan and specifications is material if "it gives a bidder a substantial advantage or benefit not enjoyed by other bidders." *Id.* at 385, 26 N.W.2d at 840. Responsiveness is determined at the time of the opening of the bid. *Carl Bolander & Sons Co. v. City of Minneapolis*, 451 N.W.2d 204, 206 (Minn. 1990).

■ In 2007, the Minnesota Legislature enacted a design-build best-value alternative to the lowest responsible bidder method of awarding public construction contracts. *See* Act of May 25, 2007, ch. 148, art. 3, 2007 Minn. Laws 2290, 2290–2303 (codified at Minn.Stat. §§ 161.3410–.3428 (2008)). Under the design-build best-value approach, the contractor submits a project design and a bid for constructing that design, based on design specifications provided by the State. Minn.Stat. § 161.3426, subd. 4(c)(1). The design-build best-value process differs from the lowest responsible bid process in that it allows public agencies to consider factors other than cost when awarding contracts. Under the design-build best-value approach, agencies may also consider:

> (1) the quality of the vendor's or contractor's performance on previous projects;

> (2) the timeliness of the vendor's or contractor's performance on previous projects;

> (3) the level of customer satisfaction with the vendor's or contractor's performance on previous projects;

> (4) the vendor's or contractor's record of performing previous projects on budget and ability to minimize cost overruns;

> (5) the vendor's or contractor's ability to minimize change orders;

> (6) the vendor's or contractor's ability to prepare appropriate project plans;

> (7) the vendor's or contractor's technical capacities;

> (8) the individual qualifications of the contractor's key personnel; or

> (9) the vendor's or contractor's ability to assess and minimize risks.

Minn.Stat. § 16C.02, subd. 4a (2008).

Although the lowest responsible bidder is still the preferred method for choosing a

contractor, the Legislature has determined that in certain situations the design-build best-value procurement approach is in the public's best interest. *See* Minn.Stat. § 161.3414, subd. 1 ("A design-build contracting procedure ... may be used for a specific project only after the commissioner determines that awarding a design-build contract will serve the public interest."); Minn.Stat. § 161.3412, subd. 3 ("The number of design-build contracts awarded by the commissioner in any fiscal year may not exceed ten percent of the total number of transportation construction contracts awarded by the commissioner in the previous fiscal year.").

When the Commissioner determines that the design-build best-value method is the appropriate means of awarding a contract, the Commissioner is required to appoint a Technical Review Committee of at least five members, one member of which is chosen by the Minnesota Chapter of the Associated General Contractors. Minn. Stat. § 161.3420, subd. 2. The Technical Review Committee scores each bidder's technical proposals using the criteria set forth in the RFP and then submits those technical scores to the Commissioner. Minn.Stat. § 161.3426, subd. 1(a). In scoring the technical proposals, the Technical Review Committee is required to "reject any proposal it deems nonresponsive." *Id.* In this case, the instructions to proposers accompanying the RFP stated that "Mn/DOT will conduct an initial review of the Technical Proposals for responsiveness to the requirements set forth in the RFP.... Technical Proposals will ... require a minimum technical score of 50 points to be responsive." Because the Technical Review Committee assigned Flatiron–Manson's proposal a technical score of 91.47, it implicitly determined that Flatiron–Manson's proposal was responsive.

■ We begin our analysis by comparing Flatiron–Manson's bid with the language of the RFP. Although an RFP is not an offer to enter into a contract, RFPs are generally construed using traditional principles of contract interpretation. *See, e.g., Vanguard Sec., Inc. v. United States,* 20 Cl.Ct. 90, 103 (1990) (citing *Blake Constr. Co. v. United States,* 202 Ct.Cl. 794, 798 (1973)). We therefore interpret the meaning of the RFP in accordance with its plainly expressed intent. *See Carl Bolander & Sons, Inc. v. United Stockyards Corp.,* 298 Minn. 428, 433, 215 N.W.2d 473, 476 (1974) ("Where the words of a written contract are plain and unambiguous, its meaning should be determined in accordance with its plainly expressed intent."). We deem an RFP ambiguous only if its language is susceptible to more than one reasonable interpretation. *See Art Goebel, Inc. v. N. Suburban Agencies, Inc.,* 567 N.W.2d 511, 515 (Minn.1997) ("A contract is ambiguous if, based upon its language alone, it is reasonably susceptible of more than one interpretation."). If the provisions of the RFP are unambiguous, they must be given their plain and ordinary meaning. *See Minneapolis Pub. Hous. Auth. v. Lor,* 591 N.W.2d 700, 704 (Minn.1999). Further, we must consider the RFP as a whole, interpreting the entire instrument so as to harmonize all of its parts as far as is reasonably possible. *See Country Club Oil Co. v. Lee,* 239 Minn. 148, 151–52, 58 N.W.2d 247, 249 (1953). Finally, because the RFP at issue here and the accompanying instructions to bidders relate to the same project, we construe them with reference to each other. *See Anderson v. Kammeier,* 262 N.W.2d 366, 371 n. 2 (Minn.1977).

Appellants first contend that Flatiron–Manson's proposal was not responsive to the RFP because it proposed work outside of the right-of-way as defined in the RFP, in violation of Section 4.3.3.5.1 of

the instructions to proposers. Specifically, appellants claim that a map included in Flatiron–Manson's proposal shows that Flatiron–Manson's proposal required work outside the right-of-way for the purpose of lowering Second Street, which runs underneath the I–35W bridge along the north side of the Mississippi River.

Section 4.3.3.5.1 of the instructions to proposers provides:

> Any work that is proposed to be constructed on I–35W with this project shall not extend beyond the 4th Street Bridge to the north and shall not extend beyond the project limits shown on the Preliminary Design Drawing to the south. The actual northerly project limits on 35W shall be determined by the Contractor, but not beyond 4th Street for this project, based on their proposed profile and alignment and their determination of the current and future improvements to I–35W, University Ave. and 4th St.

> No proposed work shall occur with this project on Washington Ave., University Ave., and 4th Street beyond the ramp termini shown on the Preliminary Design Drawing. *Proposed work for this project shall not include additional capacity or Right of Way.*

> The Proposer shall discuss how their proposed geometric enhancements will improve the geometrics and clearances of 35W, University Ave., and 4th Street after this project is completed and how the proposed geometric enhancements allows flexibility for future design and construction projects on 35W and at the interchanges.

> The Proposer shall also discuss any restrictions, deficiencies, utility impacts, contaminated materials impacts, or design exceptions that their proposed geometric enhancements may create for this project and for future projects on I–35W, University Ave., and 4th Street.

(Emphasis added.)

Appellants focus our attention on the sentence in Section 4.3.3.5.1 that reads, "Proposed work for this project shall not include additional capacity or Right of Way." Read in isolation, the sentence appears to preclude the acquisition of additional capacity or right-of-way in order to perform work on the bridge project. However, reading the sentence in isolation would require us to ignore our obligation to read each sentence in Section 4.3.3.5.1 in context with the rest of the section and the RFP.

Reading Section 4.3.3.5.1 in context and in conjunction with the RFP as a whole, it is evident that the bar in Section 4.3.3.5.1 against including "additional capacity or Right of Way" was not intended to be a project-wide directive, but a statement that was modified by other language in the section. The paragraph in which the sentence is found addresses specific limits on work performed on Washington Avenue, University Avenue, and Fourth Street. The remainder of the section discusses work on University Avenue and Fourth Street. The sentence preceding the bar on additional right-of-way prohibits work on University Avenue, Washington Avenue, or Fourth Street outside the ramp termini. The sentence following the bar on additional right-of-way instructs proposers to describe how changes made under Section 4.3.3.5.1 will improve the geometrics and clearances of University Avenue and Fourth Street. Read in context, then, the sentence that appellants contend is a project-wide limit on right-of-way is instead a bar against use of additional right-of-way only in the areas of Washington Avenue, University Avenue, and Fourth Street.

Our conclusion that Section 4.3.3.5.1 is not a project-wide prohibition against the use of additional right-of-way is supported, and appellants' contention that Flatiron–Manson's bid was not responsive because it proposed work outside of the right-of-way is undermined, by the plain language of other provisions of the RFP. Section 7.5 of the RFP, titled "Acquisition Activities," contemplates contractors acquiring additional easements and right-of-way. Section 7.5.1 sets out the process to be followed for obtaining construction easements. Section 7.5.1 provides that:

The Contractor shall notify Mn/DOT in writing of all Construction Easements necessary for construction of the Project based on the Contractor's Release for Construction (RFC) designs. This written notification shall identify the Construction Easements sought and shall include drawings depicting proposed construction limits and cross-sections. Mn/DOT will be responsible for the acquisition of all Construction Easements for the Project at the Contractor's cost. Acquisition of Construction Easements by Mn/DOT could take up to 16 calendar months for the first 10 parcels and 30 days for each additional parcel from the time the written notification is submitted by the Contractor. Schedule implications associated with the acquisition of Construction Easements shall be the responsibility of the Contractor. Payment for Construction Easements shall be made by Mn/DOT and deducted from the Contractor's monthly progress payment. The cost of Construction Easements shall be included in the Contractor's Proposal Price.

This section requires the contractor to notify MnDOT in writing of construction easements necessary for the project, specifies that MnDOT will be responsible for acquiring the easements, and puts bidders on notice as to how long acquisitions of such easements could take. Section 7.5.4 of the RFP lays out procedures for acquiring additional right-of-way after construction on the bridge has begun:

If the Contractor determines that additional R/W is necessary or required by a Change Order, the Contractor shall prepare and submit a written request to Mn/DOT for consideration. This request shall identify the additional R/W sought, along with a justification for its need, and shall include drawings depicting proposed construction limits and cross-sections. Mn/DOT will review the request, determine whether the acquisition is acceptable and within the scope of the environmental documentation, and notify the Contractor in writing regarding the schedule and process required to complete the acquisition. Mn/DOT is responsible for obtaining any required Municipal Consent, if necessary, due to the additional R/W acquisition. The Contractor shall reimburse Mn/DOT for all costs associated with such acquisitions, subject to Book 1, Section 6.1.2. Mn/DOT will require up to 16 calendar months for acquisition of the first 10 parcels and 30 Days for each additional parcel from the time of the written request. Schedule implications shall be included in the Contractor's schedule.

Given the plain language of Sections 7.5.1 and 7.5.4, we conclude the language relied on by appellants was not a project-wide ban on proposing work outside the right-of-way.

Finally, our conclusion that the language of Section 4.3.3.5.1 relied on by appellants was intended to address work on the project at University Avenue, Washington Avenue, and Fourth Street and not beyond is also supported by the affidavit of Jon Chiglo, MnDOT's project manager for the I–35W bridge replacement project. In his affidavit, he states that the right-of-way

instruction in Section 4.3.3.5.1 of the instructions to proposers was added after MnDOT received a request for clarification from a contractor that was planning to propose taking additional right-of-way and adding traffic capacity at or near the University Avenue and Fourth Street interchange. According to Chiglo, this plan would have required "more environmental review and more municipal consent." In his affidavit, Chiglo states that the instruction in Section 4.3.3.5.1 of the instructions to proposers—barring additional right-of-way in proposals—was for the limited purpose of informing proposers that MnDOT did not want additional right-of-way impacts at University Avenue, Fourth Street, and Washington Avenue. According to Chiglo, the instruction was not a "[p]roject-wide directive to proposers on right-of-way limitations"; and neither the instructions to proposers nor the RFP forbade "any proposer from obtaining right-of-way on [Second] Street."[2]

Reading all of Section 4.3.3.5.1 in context and in conjunction with the other provisions of the RFP, it is apparent that the RFP did not prohibit proposals that required additional right-of-way in areas other than University Avenue, Washington Avenue, and Fourth Street. Because we conclude that the language in Section 4.3.3.5.1 of the instructions to proposers, which provides that "[p]roposed work for the project shall not include additional capacity or Right of Way," was not a project-wide limitation on the acquisition or use of additional right-of-way, we also conclude that to the extent that Flatiron–Manson's

bid proposed work outside the right-of-way at Second Street, the bid was responsive to the RFP and the instructions to proposers.

■ We next address appellants' claim that Flatiron–Manson's proposal was not responsive because it failed to comply with the RFP's requirement that concrete-box designs use a minimum of three webs. Contractors were permitted to choose among a number of superstructure types for the bridge's design, including steel box girders, reinforced concrete box girders, and post-tensioned concrete box girders. Book 2, Section 13.3.3.1.2, of the RFP provides in relevant part that "[i]f the Contractor chooses a steel box girder design, a minimum of 3 boxes in each direction of traffic is required. A minimum of 3 webs are required for concrete box designs. The exterior webs of boxes shall be a constant slope no greater than 5:1(V:H) slope."

Flatiron–Manson's proposal included eight webs, four in each direction of traffic, but only two webs per concrete-box girder. Relying on an affidavit of Randy Reiner, a civil engineer employed by C.S. McCrossan, appellants argue that Section 13.3.3.1.2 requires a minimum of three webs per concrete-box girder. In the affidavit, Reiner states that, in conforming with this section, the proper inquiry is the number of webs within each concrete box girder. Reiner does not provide a foundation for these contentions. He does not point to any express language in Section 13.3.3.1.2 requiring three webs per concrete box girder nor does he explain, beyond the mere assertion, what it is about

2. Appellants claim that MnDOT told Ames/Lunda and C.S. McCrossan that they could not work outside of the Second Street right-of-way. However, the RFP expressly prohibits reliance on any instruction or representation that is not in writing. The instructions to proposers clearly states, "Mn/DOT will not be bound by, and Proposers shall not rely on, any oral communication regarding the Project or RFP documents." The instructions to proposers required MnDOT to prepare a written revision if any further instructions are issued and to send the information to all shortlisted proposers. MnDOT issued 9 clarifications that addressed 120 questions.

the language used in that section that makes Flatiron–Manson's and MnDOT's reading of the language unreasonable. Because the plain language of Section 13.3.3.1.2 does not expressly require three webs per concrete box girder or preclude designs providing for four webs per direction of traffic, we conclude that appellants' argument fails. Section 13.3.3.1.2 unambiguously states that for a steel-girder design, a minimum of three boxes in each direction of traffic is required. The next sentence provides that for concrete box design, three webs are required. The plain language of Section 13.3.3.1.2 does not say anything about the number of webs per box girder. Flatiron–Manson's proposal exceeded the three-web minimum requirement by having four webs for each direction of traffic for a total of eight webs. On that basis, given the record before us, we conclude that appellants' argument that Flatiron–Manson's concrete box girder design was not responsive to the RFP fails.

Accordingly, we hold that Flatiron–Manson's proposal was materially responsive to the Request for Proposals, and MnDOT's award of the I–35W bridge contract to Flatiron–Manson did not violate Minn.Stat. § 161.3426, subd. 1(a).

Affirmed.

ANDERSON, PAUL H., J., took no part in the consideration or decision of this case.

STRAS, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

GILDEA, Chief Justice.

The question presented in this case is whether the common law standard for determining the responsiveness of a bid on a public construction contract applies in the context of the "design-build" contracting process the Legislature established in Minn.Stat. § 161.3426 (2008). *See, e.g., Sutton v. City of St. Paul,* 234 Minn. 263, 269, 48 N.W.2d 436, 440 (1951) ("Unless the bid responds to the proposal in all material respects, it is not a bid at all, but a new proposition." (quoting 10 Eugene McQuillan, The Law of Municipal Corporations § 29.78 (3d ed. rev.1999))). The majority does not answer that question because it concludes that Flatiron–Manson's bid satisfied the common law responsiveness standard. Because I would hold that there are genuine issues of material fact as to whether the proposal of Flatiron–Manson was responsive under the common law standard, I disagree with the majority and would answer the legal question the parties raise. I conclude that the Legislature did not intend to incorporate the common law responsiveness standard in Minn.Stat. § 161.3426. Rather, the Legislature vested discretion in the Technical Review Committee to determine the responsiveness of proposals. I further conclude that, in determining that Flatiron–Manson's proposal was responsive to MnDOT's request for proposals, the Technical Review Committee did not abuse the discretion the Legislature gave to it. I therefore concur in the affirmance of the court of appeals.

I.

I turn first to the question of whether, as the majority concludes, Flatiron–Manson's proposal complied "in all material respects" with the request for proposals. This question comes to us on review from summary judgment. A district court is to grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to judgment as a matter of law." Minn. R. Civ. P. 56.03.

Summary judgment is not a trial of issues of fact, but rather a proceeding designed to determine if genuine issues of material fact exist. *Corwine v. Crow Wing Cnty.*, 309 Minn. 345, 361, 244 N.W.2d 482, 491 (1976). As a reviewing court, we "determine (1) if there are genuine issues of material fact and (2) if the district court erred in its application of the law." *Osborne v. Twin Town Bowl, Inc.*, 749 N.W.2d 367, 371 (Minn.2008).

The burden is on the party moving for summary judgment to show absence of any genuine issue of material fact. *W.J.L. v. Bugge*, 573 N.W.2d 677, 680 (Minn.1998). A fact is "material" for purposes of summary judgment if its resolution will affect the outcome of the case. *Zappa v. Fahey*, 310 Minn. 555, 556, 245 N.W.2d 258, 259–60 (1976). To defeat a properly supported motion for summary judgment, the nonmoving party must present evidence on an issue sufficient to permit reasonable persons to draw different conclusions. *Schroeder v. St. Louis Cnty.*, 708 N.W.2d 497, 507 (Minn.2006). The evidence is viewed in the light most favorable to the nonmoving party, in this case the appellants. *Grondahl v. Bulluck*, 318 N.W.2d 240, 242 (Minn.1982).

At the district court, appellants Sayer and Phillippi asserted that there were genuine issues of material fact as to whether the Flatiron–Manson bid complied with two provisions of the request for proposals. First, the request for proposals states: "If the Contractor chooses a steel box girder design, a minimum of 3 boxes in each direction of traffic is required. A minimum of 3 webs are required for concrete box designs." Appellants contend that there was a genuine issue of material fact as to whether Flatiron–Manson's concrete box design, utilizing only two external webs for three of the four concrete box girders carrying the roadway, complied with the requirement of "a minimum of 3 webs." Second, appellants contend there was a genuine issue of material fact as to whether Flatiron–Manson proposed work on Second Street outside of the specified right-of-way, in violation of the request for proposals.

### A.

I turn first to the question relating to the web requirement. The request for proposals limited the types of bridge superstructures that could be proposed. Specifically, the request allowed:

- Prestressed concrete I-beams
- Spliced post-tensioned concrete girders
- Steel
  - — Welded girders (including steel box girders)
  - — Rolled beams
- Cast-in-place concrete slab spans
- Post-tensioned concrete slab spans
- Reinforced concrete box girders
- Post-tensioned concrete box girders

The request for proposals further states:

If the Contractor chooses a steel box girder design, a minimum of 3 boxes in each direction of traffic is required. A minimum of 3 webs are required for concrete box designs. The exterior web of boxes shall be a constant slope no greater than 5:1(V:H) slope.

The dispute here is over the required number of webs. Like the majority, I understand a web to be a vertical structural element of a girder.

Of the four teams that submitted proposals, only Flatiron–Manson proposed a concrete-box design; the other three teams each proposed steel box girder designs. Flatiron–Manson essentially proposed to build two separate bridges, one in each direction of traffic, each bridge com-

posed of four separate spans. Each of the four spans was to be composed of a single concrete box girder. Three of Flatiron–Manson's proposed concrete box girders used two webs, forming the outside walls of the girders. The fourth proposed concrete box girder used three webs: two webs forming the outside walls of the girder and one web between them, internal to the girder.

At the district court, Flatiron–Manson argued that there was no genuine issue of material fact that its proposal was responsive to the request for proposals because it proposed a bridge with a total of eight webs: four spans in each direction of traffic, each composed of two webs forming the outside walls of each span. In other words, Flatiron–Manson counts each of the webs in its design and argues, in effect, that no "internal" webs are required if the bridge itself is constructed of multiple spans.

Even if there were a genuine issue as to Flatiron–Manson's compliance with the web requirement, I would still conclude that appellants Sayer and Phillippi failed to show how the nonresponsiveness of Flatiron–Manson's proposal in this respect gave Flatiron–Manson's proposal an unfair competitive advantage over other proposals. *See Coller v. City of Saint Paul,* 223 Minn. 376, 385, 26 N.W.2d 835, 840 (1947) (noting that a variance between a bid and a request is not "material" unless the variance results in the bidder enjoying a "substantial advantage or benefit not enjoyed by other bidders."). Flatiron–Manson's proposal was the most costly of the responses and proposed the lengthiest construction schedule, so by proposing to use a concrete box design Flatiron–Manson saved on neither cost nor time. Nor have appellants shown that a concrete box design was favored by the Technical Review Committee over the competitors' steel box

girder design. Because there is no genuine issue that Flatiron–Manson received a competitive advantage, I would hold that its bid complied with the request for proposals, even under the common law standard, as to the web requirement.

## B.

I turn next to the question regarding work outside the right-of-way. The request for proposals provides:

> No proposed work shall occur with this project on Washington Ave., University Ave., and 4[th] Street beyond the ramp termini shown on the Preliminary Design Drawing. Proposed work for this project shall not include additional capacity or Right of Way.

Appellants Sayer and Phillippi contend that Flatiron–Manson proposed to work outside of the right-of-way to lower Second Street, which runs under 35W along the north side of the Mississippi River. Appellants further contend that by proposing to work outside of the right-of-way, contrary to the requirements of the request for proposals, Flatiron–Manson was able to gain a competitive advantage over other bidders.

On the north side of the river, Interstate 35W passes *over* Second Street. To accommodate trucks and other large vehicles, the parties acknowledge that a minimum clearance over Second Street was required. The interstate then passes *under* University Avenue. To accommodate trucks and other large vehicles, federal interstates must be built with a certain minimum clearance beneath overpasses. Bidders on the bridge project were also instructed to assume "that a future structure on University Avenue and 4th Street will have an additional three feet of depth," that is, to assume that University Avenue and Fourth Street would in the future be lowered by 3 feet. In addition, federal

regulations limit the steepness of grades on interstate roadways.

To accommodate these constraints, Flatiron–Manson proposed to lower Second Street by 3 feet in the area of the 35W overpass. Appellants contend that in order to do so without creating a "trough" or "bathtub" effect, Flatiron–Manson had to create a more gradual slope or grade to that part of Second Street. According to appellants, Flatiron–Manson could do so only by lowering Second Street outside the prescribed right-of-way as well. And, appellants argue, this work outside the prescribed right-of-way was forbidden under Section 4.3.3.5.1 of the request for proposals. In response to appellants' argument, the State submitted affidavits explaining that the bar on the use of additional right-of-way was limited to right-of-way in the areas of Washington Avenue, University Avenue, and Fourth Street.

In my view, appellants have created a genuine issue of material fact as to whether the Flatiron–Manson bid complied with Section 4.3.3.5.1 of the request for proposals. Specifically, the documentary evidence, when construed in the light most favorable to appellants, shows that Flatiron–Manson proposed to do work outside of the prescribed right-of-way in order to lower Second Street. I also conclude that appellants Sayer and Phillippi created a genuine issue of material fact as to whether, by failing to comply with the request for proposals, Flatiron–Manson obtained a competitive advantage over other bidders. In particular, appellants point to deposition testimony, by at least one member of the Technical Review Committee, that Flatiron–Manson's bid received much higher technical scores than its competitors precisely because of the roadway profile that it proposed.

The majority reaches the opposite conclusion because it concludes that Section 4.3.3.5.1's bar on additional right-of-way is limited to work performed on Washington Avenue, University Avenue, and Fourth Street. To support its conclusion, the majority relies on other sentences within Section 4.3.3.5.1 that prohibit work on University Avenue, Washington Avenue, or Fourth Street outside the ramp termini and that instruct proposers to describe how changes made under Section 4.3.3.5.1 will improve the geometrics and clearances of University Avenue and Fourth Street. But the operative section of Section 4.3.3.5.1—the one that bars additional work outside the then-existing right-of-way—is not limited geographically. In addition, this sentence prohibits additional roadway capacity, a prohibition that appears to be effective only if it is read as a project-wide limitation. Several additional sentences within the section also contain no area restrictions, suggesting that they apply project-wide. Finally, the topic sentence for Section 4.3.3.5.1 is not limited to one area of the project, but frames the section as applying project-wide: "The Proposal shall include the Proposer's commitments to enhance the geometric features of the project and eliminate or minimize design exceptions." In other words, I read the section as applying on a project-wide basis unless the specific sentence at issue includes area restrictions. Because the sentence that prohibits work outside the right-of-way has no area limitation, I read it as applying to the entire project.

The majority's opposite construction adds words to Section 4.3.3.5.1 so that it reads: "Proposed work for this project shall not include additional capacity *anywhere in the project* or Right of Way *in the area of Washington Avenue, University Avenue, or Fourth Street.*" But we cannot add words to the request for proposals under the guise of interpreting it. *Foley Bros. v. St. Louis Cnty.*, 158 Minn.

320, 328, 197 N.W. 763, 766 (1924) ("The meaning apparent upon the face of this contract is the one which alone we are at liberty to say was intended to be conveyed. There is, in fact, no room for construction. That which the words declare is the meaning of the contract, and we have no right to add to or take away from that meaning.").

The majority also relies on Section 7.5 of the request for proposals, titled "Acquisition Activities." But, as the majority acknowledges, this provision outlines the process to be followed for obtaining additional right-of-way *after construction of the bridge has begun.* Creation of a process for obtaining additional right-of-way after construction has begun is not inconsistent with a ban on proposing a bridge design that relies on additional right-of-way in the first place.

Finally, the majority relies on the affidavit of MnDOT's project manager, who attests that the instruction in Section 4.3.3.5.1 of the request for proposals was not intended to be a "[p]roject-wide directive to proposers on right-of-way limitations." According to the project manager, MnDOT inserted the sentence at issue into Section 4.3.3.5.1 for the "limited purpose" of "informing proposers that MnDOT did not want additional right-of-way impacts at University Avenue, Fourth Street, and Washington Avenue." Because we construe a request for proposals in the same way we construe contracts, to the extent that the project manager's affidavit contradicts the plain language of the request for proposals I would not consider it. *See Kehne Elec. Co. v. Steenberg Const. Co.,* 287 Minn. 193, 197 n. 5, 177 N.W.2d 309, 311 n. 5 (1970) (evidence of preliminary negotiations cannot be admitted to contradict or vary the plain terms of a written contract).

Based on my review of the record, I would hold that there was a genuine issue of material fact as to whether Flatiron–Manson's proposal complied with Section 4.3.3.5.1 of the RFP under the common law standard.

II.

Having concluded that there was a genuine issue of material fact as to whether Flatiron–Manson's proposal complied with MnDOT's request for proposals, I nevertheless would affirm the court of appeals because in drafting Minn.Stat. § 161.3426 (2008), the Legislature explicitly allowed the Technical Review Committee to treat as responsive bids that, under the common law standard, would be nonresponsive to the state's request for proposals.

Minnesota Statutes § 161.3426, subdivision 1(a), provides:

> The Technical Review Committee shall score the technical proposals using the selection criteria in the request for proposals (RFP). The Technical Review Committee shall then submit a technical proposal score for each design-builder to the commissioner. The Technical Review Committee shall reject any proposal it deems nonresponsive.

We give a statute's words their plain and ordinary meaning. *State v. Koenig,* 666 N.W.2d 366, 372 (Minn.2003). "Deem" means to treat something "as if (1) it were really something else, or (2) it has qualities that it does not have." *Black's Law Dictionary* 477 (9th ed.2009). The plain language of section 161.3426 therefore gives the Technical Review Committee discretion to determine—to "deem"—a proposal to be nonresponsive to the request for proposals, whether or not it would have been nonresponsive under common law government contracting principles. And if

the Technical Review Committee has discretion to "deem" a proposal to be nonresponsive, it necessarily has the discretion to "deem" a proposal to be responsive as well.

Examining the statute in context confirms my interpretation. *See Christensen v. Hennepin Transp. Co.*, 215 Minn. 394, 409, 10 N.W.2d 406, 415 (1943) ("Words and sentences [of statutes] are to be understood in no abstract sense, but in the light of their context"). In subdivision 1, the Legislature directed the Technical Review Committee to score each bid "using the selection criteria in the request for proposals," and to reject any proposal it deems nonresponsive. Minn.Stat. § 161.3426, subd. 1. In subdivision 4, the Legislature established a different process, the "low-bid design-build process." Minn. Stat. § 161.3426, subd. 4. In this process, the Legislature also charged the Technical Review Committee with determining whether the bids were responsive. Minn. Stat. § 161.3426, subd. 4(c)(1). But the Legislature cabined the committee's discretion by specifically limiting the committee's determination to whether the bid "complies with the requirements of the RFP and is responsive." *Id.* In subdivision 4 the committee is expressly forbidden from "ranking or scoring" the bids. *Id.* Subdivision 1, by contrast, directs the committee to assign scores to each bid based on the criteria in the request for proposals and to reject proposals it deems nonresponsive, but this subdivision does not specifically link the committee's responsiveness determination to the criteria in the request for proposals. *See* Minn. Stat. § 161.3426, subd. 1. In other words, under subdivision 1, the question of whether the Flatiron–Manson bid was "responsive" under the statute was the Technical Review Committee's to answer. The

Technical Review Committee deemed the Flatiron–Manson bid to be responsive to the request for proposals and we must accord that determination deference. *See, e.g., In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.*, 624 N.W.2d 264, 277 (Minn.2001).

Appellants emphasize that we have construed the term "responsive" to require that a response comply with the request for proposals in all material respects, and that under Minn.Stat. § 645.17(4) (2008), once we have "construed the language of a law," we are to presume that "the legislature in subsequent laws on the same subject matter intends the same construction to be placed upon such language." But Section 645.17 establishes no more than presumptions to be used in ascertaining the intention of the Legislature, and presumptions can be overridden by clear statutory language. In this case, the language of the statute is clear: the Technical Review Committee has discretion to determine whether a proposal is "responsive" to the request for proposals.

I therefore respectfully concur in the result.

DIETZEN, Justice (concurring).

I join in the concurrence of Chief Justice Gildea.