STATE OF MINNESOTA

IN SUPREME COURT

A13-1477

Court of Appeals                                                                    Stras, J.
                                                                Dissenting, Gildea, C.J.
                                                                Took no part, Dietzen, J.

Rochester City Lines, Co.,

                    Appellant,

vs.                                                                      Filed:  August 19, 2015
                                                                    Office of Appellate Courts

City of Rochester et al.,

                    Respondents,

First Transit, Inc.,

                    Respondent.

_____

Gary A. Van Cleve and Rob A. Stefonowicz, Larkin Hoffman Daly & Lindgren Ltd., Minneapolis, Minnesota, and

Steven A. Diaz, Law Office of Steven A. Diaz, Washington, D.C., for appellant.

John M. Baker and Monte A. Mills, Greene Espel, P.L.L.P., Minneapolis, Minnesota, for respondents City of Rochester et al.

Charles K. Maier, Matthew G. Plowman, and Richard C. Landon, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minnesota, for respondent First Transit, Inc.

Richard P. Schweitzer and Craig M. Cibak, Richard P. Schweitzer, PLLC, Washington, D.C., and

Adam S. Huhta, Huhta Law Firm, PLLC, Minneapolis, Minnesota, for amicus curiae American Bus Association.

Dean B. Thomson and Jeffrey A. Wieland, Fabyanske, Westra & Hart & Thomson, Minneapolis, Minnesota, for amicus curiae Associated General Contractors of Minnesota.

Susan L. Naughton, League of Minnesota Cities, for amicus curiae League of Minnesota Cities.

Robert E. Cattanach and Theresa M. Bevilacqua, Dorsey & Whitney LLP, Minneapolis, Minnesota, and

Dan. R. Mastromarco, The Mastromarco Firm, PLLP, Annapolis, Maryland, for amicus curiae United Motorcoach Association, Inc.

_____

## S Y L L A B U S

1. The appropriate standard of review for a city's "best value" bidding process is the unreasonable, arbitrary, or capricious standard from *Griswold v. Ramsey County*, 242 Minn. 529, 65 N.W.2d 647 (1954).

2. The district court properly granted summary judgment to the City of Rochester on claims that its request for proposals for a bus-service contract contained unlawful terms and that an "organizational conflict of interest" invalidated the bidding process.

3. The district court lacked subject matter jurisdiction over the City of Rochester's quasi-judicial decisions.

4. The district court erred in granting summary judgment to the City of Rochester on the question of whether it acted unreasonably, arbitrarily, or capriciously in awarding a municipal-bus-service contract to First Transit, Inc.

Affirmed in part, reversed in part, and remanded.

OPINION

STRAS, Justice.

This case involves two questions arising out of the City of Rochester's selection of a contractor to run its municipal bus service. The first question requires us to determine the appropriate standard of review for an award of a government contract through a "best value" bidding process, a method by which a government contractor is selected by weighing various quantitative and qualitative factors. The second question is whether the district court properly granted summary judgment to the City of Rochester on appellant Rochester City Lines's claims of unfair bias and favoritism in awarding the contract to another bidder. Because we conclude that the district court properly granted summary judgment on each of Rochester City Lines's claims, except the general claim that the City of Rochester acted unreasonably, arbitrarily, or capriciously in awarding the contract to another party, we affirm in part, reverse in part, and remand to the district court for further proceedings consistent with this opinion.

I.

For more than 30 years, Rochester City Lines, Co. ("RCL") operated the municipal bus service in Rochester. Although the City of Rochester ("City") owns the buses, bus-stop shelters, and other equipment, it contracted with RCL to operate the bus service through a series of annual contracts. The City subsidized the operation through the receipt of state and federal grants.

In 2011, the Federal Transit Administration ("FTA") sent the City a series of letters in which it informed the City that, in order to comply with federal procurement

3

requirements and continue to receive federal funding, the City needed to initiate a competitive bidding process for its next contract. The City, which was receiving approximately $1.6 million annually in FTA funding, complied with the FTA's direction and issued a Request for Proposals ("RFP") in December 2011. Following the methodology of the FTA's guidance documents, the RFP stated that the City would use a "best value" bidding process to select the proposal that presented "the highest quality of service that best matche[d] the City's requirements," based on a set of predetermined criteria. RCL filed a formal "bid protest" in an attempt to stop the bidding process, claiming that the City's actions were an unconstitutional taking of RCL's property. The bid protest failed, and RCL filed a lawsuit against the City.

RCL again unsuccessfully attempted to stop the bidding process, this time by filing a motion for a temporary injunction with the district court. The competitive-bidding process continued, and the City received responsive bids from RCL and three other companies. An evaluation committee, consisting of four City employees and four outside reviewers, determined that the bid submitted by First Transit, Inc., a national bus-transportation company, presented the best value for the City. The Rochester City Council followed the committee's recommendation and awarded the contract to First Transit on April 2, 2012.

After the City finalized its selection of First Transit, RCL filed another formal bid protest. The City Attorney, acting under the terms of the RFP, denied RCL's protest, and the City Council affirmed his decision. RCL subsequently amended its complaint to add claims against the City, members of the City Council, and First Transit, including a claim

4

seeking a declaration that the bidding process was unlawful. RCL also sued a member of the City Council for defamation. In the meantime, First Transit began operating Rochester's municipal bus service on July 2, 2012. Unable to compete with a federally subsidized operation, RCL ended its fixed-route service in Rochester the following day.

In November 2012, the district court granted summary judgment to the respondents, including the City, on each of RCL's claims. The court of appeals affirmed. *Rochester City Lines, Co. v. City of Rochester*, 846 N.W.2d 444 (Minn. App. 2014). We granted RCL's petition for review to resolve two issues: (1) the applicable standard of review of a "best value" competitive bidding process; and (2) whether the district court erred when it granted summary judgment to the City on RCL's bid-protest claims. We denied review of all other issues decided by the court of appeals.[1]

II.

The first question presented in this case requires us to identify the standard of review applicable to a best-value bidding process used by a municipality or other political subdivision of the state. Best-value bidding, as described by the FTA, is a procedure by which the award of a government contract depends on "which proposal represents the 'best value' [based] on an analysis of the tradeoff of qualitative technical factors and price or cost factors." U.S. Dep't of Transp., Third-Party Contracting Guidance, FTA Circular 4220.1F, VI-10 (Nov. 1, 2008, rev. Mar. 18, 2013) (hereinafter "FTA Guidance"); *see also Sayer v. Minn. Dep't of Transp.*, 790 N.W.2d 151, 156 (Minn.

---

[1]    We denied review of RCL's takings, inverse condemnation, defamation, due process, 42 U.S.C. §§ 1983 and 1988 (2012), and 49 U.S.C. § 5323 (2012) claims.

5

2010) (recognizing that the "best-value process differs from the lowest responsible bid process in that it allows public agencies to consider factors other than cost when awarding contracts"). Here, in accordance with the FTA Guidance, the City adopted best-value bidding in its RFP and described it as

> a selection process in which proposals contain both price and qualitative components, and award is based upon a combination of price and qualitative considerations. Qualitative considerations may include technical design, technical approach, quality of proposed personnel, and/or management plan. The award selection is based upon consideration of a combination of technical and price factors to determine (or derive) the offer deemed most advantageous and of the greatest value to the procuring agency.

Before the Legislature authorized best-value bidding for public construction projects in 2007, the dominant procedure in Minnesota for government procurement was the lowest-responsible-bidder process.[2] Although public entities rarely used the best-value process prior to 2007, our cases have never distinguished between the various methods of bidding when discussing the basic principles that guide our review of cases involving government contracts. To the contrary, "[i]rrespective of what lawful method is adopted or used in the letting of public contracts, it is for the courts to determine whether officials in the exercise of their discretion have applied the method used in an

---

[2] The lowest-responsible-bidder process requires a public agency to release the design and specifications for a government contract in advance of bidding. *See Sayer*, 790 N.W.2d at 155-56. Once the period for submitting a bid expires, the agency eliminates all non-conforming bids that "have a material variation from the given specifications." *Id.* at 156. Of the remaining bids, the agency *must* award the contract to the qualifying bidder that offers to complete the contract at the lowest price. *Id.*

6

arbitrary, capricious, or unreasonable manner." *Griswold v. Ramsey Cty.*, 242 Minn. 529, 535, 65 N.W.2d 647, 651-52 (1954).

In *Griswold*, the Ramsey County Board allocated money for construction of a county jail and released design specifications in advance of the bidding. *See id.* at 531, 65 N.W.2d at 649. Because all of the submitted bids exceeded the amount of money allocated for the jail, however, the Board asked each bidder to subtract from its basic bid the cost of certain items contained in the construction specifications. *See id.* These alternative bids allowed the County to proceed with part of the construction and then finish the remainder of the jail once funds became available. *See id.* at 531-32, 65 N.W.2d at 650. As it turned out, the County was able to find additional funds for the jail prior to the construction, and it allocated those funds toward the completion of some of the items listed in the winning bidder's alternative bid. *See id.* at 532, 65 N.W.2d at 650.

Two taxpayers sued the County, arguing that the bidding process adopted by the County was unlawful. *See id.* at 532, 65 N.W.2d at 650. In addressing the procedures adopted by the County, we noted that no statute required the Board to adopt a competitive-bidding process because, based on Ramsey County's population, the applicable statutes required competitive bidding only for the procurement of goods, materials, and supplies, not for the construction of public buildings. *See id.* at 533, 65 N.W.2d at 650. Nevertheless, even in the absence of a statutory mandate, we held that once the County adopted a lawful method for selecting a contractor, it had to give "all contractors an equal opportunity to bid" and not pursue its chosen method "in an unreasonable, arbitrary, or capricious manner." *Id.* at 535, 65 N.W.2d at 652. We then

7

concluded that the alternative-bidding process that the Board adopted was unreasonable, arbitrary, and capricious because it allowed bidders to make material changes to their bids after the bidding had closed. *See id.* at 536, 65 N.W.2d at 652.

*Griswold* stands for the proposition that, in the absence of a statutory standard and regardless of the method of bidding selected by a public agency, "it is for the courts to determine whether officials in the exercise of their discretion have applied the method used in an arbitrary, capricious, or unreasonable manner" upon receiving a proper challenge. *Id.* at 535, 65 N.W.2d at 651-52; *see also Tel. Assocs., Inc. v. Saint Louis Cty. Bd.*, 350 N.W.2d 398, 400 (Minn. App. 1984) (applying the unreasonable, arbitrary, and capricious standard to a best-value bidding process), *aff'd*, 364 N.W.2d 378, 381-82 (Minn. 1985). In this case, as in *Griswold*, there is no statute that required the City to award the municipal-bus-service contract based on any specified bidding process, nor is there any statute that addresses our standard of review. The contract is exempt from the Uniform Municipal Contracting Law, Minn. Stat. § 471.345, subd. 2 (2014), because it does not fall within the statute's definition of "contract." *See Hubbard Broad., Inc. v. Metro. Sports Facilities Comm'n*, 381 N.W.2d 842, 846-47 (Minn. 1986). The Minnesota Administrative Procedure Act is also inapplicable because municipalities are not included within its scope. *See* Minn. Stat. § 14.02, subd. 2 (2014) (defining "agency" to include only those entities with statewide jurisdiction). Accordingly, in the absence of a statutory standard, *Griswold* provides the standard of review for best-value-bidding processes.

8

The primary disagreement among the parties is the level of scrutiny required by *Griswold*. RCL interprets *Griswold* as requiring courts to exercise robust judicial review to invalidate any excessive exercise of discretion by a public agency, even in best-value bidding. The City and First Transit, in contrast, argue that *Griswold* requires courts to defer to value judgments made in weighing the subjective factors in best-value bidding, such that only "significant errors" that draw into doubt the overall fairness of the process and the good faith of the public agency would warrant intervention by a court. The court of appeals announced yet a third approach, largely disconnected from *Griswold*, that adopted what it referred to as "principles of common-law competitive-bidding," but only when those principles are consistent with best-value bidding processes. *Rochester City Lines*, 846 N.W.2d at 455. Neither the parties nor the court of appeals accurately describes our standard of review.

We have long applied the standard of review identified in *Griswold* to judicial review of various agency actions, including actions taken by municipalities and other political subdivisions. *See, e.g.*, *Carl Bolander & Sons v. City of Minneapolis*, 502 N.W.2d 203, 207 (Minn. 1993) (applying the unreasonable, arbitrary, or capricious standard of review to a city's decision to require an Environmental Assessment Worksheet before approving a project). In general terms, we have described an agency action as arbitrary and capricious if it represented an exercise of the agency's "will" rather than its "judgment." *Markwardt v. State Water Res. Bd.*, 254 N.W.2d 371, 374 (Minn. 1977). Although we have explained that the unreasonable, arbitrary, and capricious standard is "nonintrusive," *Dietz v. Dodge Cty.*, 487 N.W.2d 237, 239 (Minn.

9

1992), *Griswold* says that any procedure that "emasculates the safeguards of competitive bidding" invalidates the process and the contract, 242 Minn. at 536, 65 N.W.2d at 652. The essential safeguard of competitive bidding is, as we stated in *Griswold*, to "limit the discretion of contract-making officials" to prevent "such abuses as fraud, favoritism, improvidence and extravagance." *Id.* The standard, in other words, requires courts to examine the bidding procedures to ensure that they provide a fair process and incorporate sufficient controls to safeguard against abuses, *see Griswold*, 242 Minn. at 536, 65 N.W.2d at 652, but it does not allow courts to substitute their judgments for those of public officials, *Vill. of Edina v. Joseph*, 264 Minn. 84, 93, 119 N.W.2d 809, 815 (1962).

In the area of government contracts, federal courts have developed standards to guide the exercise of judicial review over procurement decisions by federal agencies. *See, e.g.*, *PAI Corp. v. United States*, 614 F.3d 1347, 1351 (Fed. Cir. 2010). The federal standards ensure that a government agency acts in good faith, not as a pretense "to let the contract to some favored bidder," and selects the bid that is "most advantageous to the Government." *Heyer Prods. Co. v. United States*, 140 F. Supp. 409, 414 (Ct. Cl. 1956). In conducting a review of competitive-bidding processes, federal courts look to the following factors to determine whether a government agency's actions were arbitrary and capricious:

> subjective bad faith on the part of the officials; the absence of a reasonable basis for the administrative decision; the amount of discretion entrusted to the procurement officials by applicable statutes and regulations; and proven violation of pertinent statutes or regulations.

*Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed. Cir. 1988). Not all of the factors need to be present to establish arbitrary and capricious behavior by a government agency, and the application of the factors depends on the facts of each case. *Id.* Because the federal standards have the same basic objectives of eliminating favoritism and fraud in procurement decisions and ensuring the good-faith conduct of government officials in securing government contracts, they are instructive in determining whether the acts of a municipality or other political subdivision are unreasonable, arbitrary, or capricious under *Griswold*.

Accordingly, we hold that the unreasonable, arbitrary, or capricious standard adopted in *Griswold* is the appropriate standard for reviewing a city's or county's decision to award a government contract after a "best value" bidding process.

III.

The second question in this case requires us to determine, based on *Griswold* and the evidence presented to the district court at the summary-judgment stage, whether the district court erred when it granted summary judgment to the City and First Transit. As relevant here, the district court found that various irregularities during the bidding process did not rise to the level of arbitrary or capricious behavior by the City. It therefore concluded that, even after drawing all inferences in RCL's favor, there were no genuine issues of material fact for trial. In affirming the district court's grant of summary judgment, the court of appeals reached the same conclusion. *Rochester City Lines*, 846 N.W.2d at 462.

11

We review a district court's grant of summary judgment de novo to determine (1) whether there are any genuine issues of material fact, and (2) whether the district court correctly applied the law. *Mattson Ridge, LLC v. Clear Rock Title, LLP*, 824 N.W.2d 622, 627 (Minn. 2012). A fact is material "if its resolution will affect the outcome of a case." *O'Malley v. Ulland Bros.*, 549 N.W.2d 889, 892 (Minn. 1996). At the summary-judgment stage, we view the evidence in the light most favorable to the nonmoving party—here, RCL—and resolve all doubts and factual inferences against the moving parties—here, the City and First Transit. *Nord v. Herreid*, 305 N.W.2d 337, 339 (Minn. 1981).

We can sort RCL's claims into four general categories. The first two include challenges to the terms of the RFP and the procedures undertaken by the City in addressing the bid protest. RCL's third claim alleges that an "organizational conflict of interest" on the part of First Transit, the winning bidder, contaminated the entire process. RCL's final claim is that the cumulative irregularities in the bidding process rendered the City's actions arbitrary, capricious, or unreasonable. We address each of RCL's arguments in turn.

## A.

RCL's first claim relates to the terms of the RFP, which it characterizes as "excessive." Specifically, RCL argues that the requirements for cash reserves were "unreasonable" and that the company's successful operations made it unnecessary and unfair for it, as the incumbent contractor, to have to obtain outside references.

Regardless of the merits of RCL's argument, it has forfeited this claim by failing to raise it in accordance with the pre-bid protest procedures outlined in the RFP. According to the RFP, "[p]rotests regarding any aspect of the RFP document, attached materials, and [the City's] selection procedures must be submitted in writing prior to the proposal opening date and time." RCL submitted a pre-bid protest, but as RCL concedes, its protest was limited to the claim that opening the contract for public bidding constituted an unconstitutional taking of its property. Nowhere in the documents submitted to the City prior to the bidding did RCL object to any of the contractor qualifications as unreasonable or excessive. Indeed, once the City denied RCL's pre-bid protest, RCL submitted a responsive bid to the City. As a federal district court in Minnesota recently observed, "[c]ontractors 'cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive an award and then, if unsuccessful, claim the solicitation was infirm.' " *C.S. McCrossan Constr., Inc. v. Minn. Dep't of Transp.*, 946 F. Supp. 2d 851, 862 n.17 (D. Minn. 2013) (quoting *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1314 (Fed. Cir. 2007)). Accordingly, by failing to use the administrative procedure provided by the City, RCL forfeited its challenge to the terms of the RFP.

B.

RCL's second claim alleges that the City Attorney, the individual who made the initial determination to deny RCL's bid-protest filings, was biased. The source of the City Attorney's bias, according to RCL, is that, by advising and counseling the City on the RFP and the bidding process, the City Attorney had an inherent conflict of interest

13

that disqualified him from making a decision, preliminary or otherwise, on RCL's bid protests.

RCL characterizes the City's denials of its bid-protest filings as quasi-judicial decisions. However, rather than seeking a writ of certiorari from the City's decisions in the court of appeals, as required by statute, RCL instead filed an action in Olmsted County District Court. *See* Minn. Stat. § 606.01 (2014). To the extent that RCL challenges the City's quasi-judicial decisions in the current action, those challenges were never properly before the district court because such decisions are reviewable only by writ of certiorari in the court of appeals. *See Cty. of Washington v. City of Oak Park Heights*, 818 N.W.2d 533, 539 (Minn. 2012). We agree with RCL that the City's bid-protest denials were quasi-judicial decisions.

Broadly speaking, we have described legislative acts as those that affect the rights of the public generally, whereas quasi-judicial acts are those that affect the rights of just a few individuals. *Id.* We have recognized that quasi-judicial decisions share three characteristics: (1) an investigation into a disputed claim and the weighing of evidentiary facts; (2) the application of those facts to a prescribed standard; and (3) a binding decision regarding a disputed claim. *Id.* at 540.

As RCL acknowledges, the City investigated RCL's claims and weighed the facts under the standards contained in the RFP, the FTA Circular, and various federal statutes. For example, the City rejected some of RCL's claims, including the claim of bias by the City Attorney, based on section 5.1.2 of the RFP, which required bidders to challenge the terms of the RFP in a pre-bid protest. After considering the facts in light of the RFP, the

FTA Circular, and federal-contracting statutes, the City issued a binding decision rejecting RCL's claims. The presence of each of the three characteristics of a quasi-judicial decision means that the City's bid-protest denials were reviewable only by writ of certiorari in the court of appeals. *Id.* at 539; *Handicraft Block Ltd. P'ship v. City of Minneapolis*, 611 N.W.2d 16, 24 (Minn. 2000) (holding that a decision by a city with all three characteristics of a quasi-judicial decision was reviewable only by the court of appeals). Accordingly, because RCL's second claim challenges the City's quasi-judicial decisions, the district court lacked subject matter jurisdiction to consider it.

## C.

RCL's third claim alleges that First Transit, the winning bidder, had an "organizational conflict of interest" that rendered the entire process void. Under federal law, an organizational conflict of interest exists when, "because of other activities or relationships with other persons, a person is unable or potentially unable to render impartial assistance or advice to the Government, or the person's objectivity in performing the contract work is or might be otherwise impaired, or a person has an unfair competitive advantage." 48 C.F.R. § 2.101 (2014). The FTA Guidance, which the City incorporated by reference in the RFP, states that an organizational conflict of interest can arise when a bidding contractor: (1) is unable to provide impartial or objective assistance to the agency; (2) has unequal access to nonpublic information; or (3) has been allowed to establish biased ground rules. *See* FTA Guidance, *supra*, at VI-5. The FTA Guidance required the City to identify and evaluate potential organizational conflicts of interest, and to take steps to avoid or mitigate them. FTA Guidance, *supra*, at VI-5-VI-6.

15

The basis for RCL's claim that an inadequately mitigated organizational conflict of interest existed is a conversation in which a City employee told First Transit's general manager that RCL's operations manager, Randy Huston, was "someone who [the City] like[d] . . . [,] someone who kn[ew] the operation." RCL argues that the City gave First Transit an "unfair competitive advantage" by revealing proprietary information.

To establish an organizational conflict of interest under the second category of the FTA Guidance, a contractor must show not only that another contractor "has an unfair competitive advantage," but also that the contractor gained such an advantage "through obtaining access to nonpublic information during the performance of an earlier contract." FTA Guidance, *supra*, at VI-5; *see Jacobs Tech. Inc. v. United States*, 100 Fed. Cl. 198, 210 (2011). Here, it is undisputed that First Transit has never had, much less performed, another contract with the City, so RCL's unequal-access claim cannot give rise to an organizational conflict of interest.

First Transit also did not have impaired objectivity, because there is no evidence that it assisted the City in evaluating itself or its competitors. *Vantage Assocs., Inc. v. United States*, 59 Fed. Cl. 1, 10 (2003). Nor did First Transit create biased ground rules, because it did not assist the City in setting the terms of the RFP. *Id.* Moreover, even if there were evidence of a conflict, there is certainly nothing to indicate that such a conflict was "so pervasive" that it would require the invalidation of the entire bidding process. *See PAI Corp v. United States*, 614 F.3d 1347, 1351 (Fed. Cir. 2010). In sum, nothing in the record shows, either directly or by implication, that First Transit's activities or relationships resulted in an organizational conflict of interest.

16

D.

RCL's final, "catch all" claim is that numerous irregularities in the bidding process suggest that the City's decision to award the bus-service contract to First Transit was arbitrary, capricious, or unreasonable under *Griswold*.[3]  Because the district court granted summary judgment to the City and First Transit on RCL's claims, the question before us is not whether RCL will eventually prevail at trial, but whether genuine issues of material fact exist and the district court correctly applied the *Griswold* standard.  *DLH, Inc. v. Russ*, 566 N.W.2d 60, 70 (Minn. 1997) ("The district court's function on a motion for summary judgment is not to decide issues of fact, but solely to determine whether genuine factual issues exist.").

Based on *Griswold*, we must determine whether the evidence regarding alleged procedural irregularities, viewed in the light most favorable to RCL, would permit a fact-finder to reasonably conclude that the City's decision to award the contract to First Transit was arbitrary, capricious, or unreasonable.  *See* 242 Minn. at 535, 65 N.W.2d at 652.  For at least two reasons, RCL has presented sufficient evidence to create a genuine issue of material fact on the question of whether the City awarded the contract to First Transit based on an unfair and biased process.

First, the record contains evidence that the interview process involved inconsistencies that might demonstrate favoritism toward First Transit.  When First

---

[3]     In contrast to the City's decision to deny RCL's bid protests, the City's decision to award the contract to First Transit was not a quasi-judicial decision, because the bidding process did not involve the resolution of a "disputed claim."  *See City of Oak Park Heights*, 818 N.W.2d at 540.

17

Transit submitted its bid, it listed two of RCL's managers as among the personnel who would manage the bus system if it received the contract from the City. First Transit's bid appears to have been consistent with the City's requirement that each of the bidders make a good-faith effort to hire RCL employees if selected. However, as part of the selection process, the City also asked bidders to have their key managers attend an interview with the City's evaluation committee. First Transit was the only bidder among the four that received permission from the City to substitute other employees for the managers it listed in its bid to represent it at the interview with the committee. Then, rather than basing its interview scores only on the personnel who actually attended the interview on behalf of each bidder, the committee awarded points to *both* RCL and First Transit based on the performance of the two RCL managers during RCL's interview. The City never informed the other bidders that it had allowed First Transit to list RCL's managers in its bid, to bring substitute personnel to its interview, or that it had awarded points to First Transit based on the performance of RCL's managers during RCL's interview. Based on this evidence, RCL argues that the City violated the terms of the RFP and showed favoritism toward First Transit.

Second, RCL produced evidence that two employees of the City who had initially agreed to serve as references for RCL later refused to do so based on advice from the City. Specifically, RCL relied on evidence, obtained during discovery, that the City Attorney advised these two employees not to serve as references because it would interfere with their duties on the evaluation committee. However, despite deciding that they would no longer serve as references based on the City Attorney's advice, neither

18

employee informed RCL of the decision to withdraw as a reference, which reduced the total number of points available to RCL on the past-performance criterion. As the district court found, these actions "effectively left RCL in the lurch" and are "objectively subject to criticism."

Evidence of these two procedural irregularities raises the specter of pervasive bias against RCL, even if, as the dissent argues, there are other legitimate explanations for the City's actions. At least at this stage of the case, the evidence in the record does not exclude the possibility that bias against RCL, or favoritism toward First Transit, improperly influenced the City's bidding process. RCL is entitled to a trial on whether the City made the award arbitrarily, capriciously, or unreasonably.

In granting summary judgment to the City and First Transit, the district court improperly drew inferences against RCL and ignored contradictory evidence in the record, both of which the district court may not do on summary judgment. We have reiterated on numerous occasions that district courts are not permitted to weigh the evidence in deciding a motion for summary judgment, *see, e.g.*, *DLH*, 566 N.W.2d at 70, and that any inferences must be drawn against, rather than in favor, of the moving party, *see J.E.B. v. Danks*, 785 N.W.2d 741, 751 (Minn. 2010).

The dissent makes the same error as the district court by improperly drawing inferences in favor of the City. Even if, as the dissent argues, the relevant facts were not in dispute, the parties vigorously disagree about whether the procedural irregularities in the record are indicative of pervasive bias by the City, or alternatively, whether they were just inadvertent errors that had no relevance to the City's bidding process. The point is

that reasonable minds can disagree about the inferences that may be drawn from the record, and as we have repeatedly stated, "summary judgment is inappropriate when reasonable [people] might draw different conclusions from the evidence presented." *DLH*, 566 N.W.2d at 69 & n.6 (collecting cases).[4]

IV.

For the foregoing reasons, we affirm the judgment of the court of appeals in part, reverse in part, and remand to the district court for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

DIETZEN, J., took no part in the consideration or decision of this case.

---

[4] In focusing on just two of the factual disputes between the parties, we do not mean to suggest that none of the other issues raised by RCL establishes a genuine issue of material fact for trial. Rather, we highlight these two aspects of the case because they are illustrative of why the district court erred when it granted summary judgment to the City and First Transit on RCL's *Griswold* claim.

DISSENT

GILDEA, Chief Justice (dissenting).

I respectfully dissent. The majority determines that the proper standard of judicial review for a city's "best value" bidding decision is the "arbitrary, capricious, or unreasonable" standard from *Griswold v. Ramsey County*. 242 Minn. 529, 535, 65 N.W.2d 647, 652 (1954). I do not disagree that *Griswold* provides the standard for judicial review. But applying that standard within the context of "best value" bidding requires particular care because of the subjective nature of the "best value" determination and the amount of discretion such a process vested in the City. *See Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1355 (Fed. Cir. 2004) ("It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value.").

The Request for Proposals that the City issued made plain the subjective nature of the process. The City told prospective bidders that the City's "primary desire . . . for this procurement is to ensure an award will be made based on the highest quality of service that best matches the City's requirements" and that the City would be "using the Federal Transit Administration's . . . approved Third Party Contracting Guidance . . . 'Best Value' methodology." Under this methodology, "best value" means that the contract will be awarded "based upon consideration of a combination of technical and price factors to determine (or derive) the offer deemed most advantageous and of the greatest value to the

D-1

procuring agency." Federal Transit Administration, *Best Practices Procurement Manual* 82 (2005), http://www.fta.dot.gov/documents/BPPM_fulltext.pdf.

Our court has not yet addressed how the arbitrary and capricious standard is to be applied in the context of best-value procurement. And, in my view, it is not necessary to define completely how the arbitrary and capricious standard is to be applied in every context of "best value" bidding. One example of where a court has determined that the standard is met provides sufficient guidance for resolution of this case. *See Heritage of Am., LLC v. United States*, 77 Fed. Cl. 66 (2007). In that best-value case, the government solicited proposals for support services for a continuing education program. *Id.* at 68. The plaintiff, an unsuccessful bidder, received the best ratings in two of the criteria listed in the solicitation document, and its bid was the lowest in terms of price for two of the regions where the contract was to be awarded and was the second lowest in a third region. *Id.* at 69. The plaintiff sued, contending that the government's decision to award the contract to another bidder was arbitrary and capricious. *Id.* at 69-70. The court agreed. *Id.* at 80.

The court described the plaintiff's burden as "heavy" and said that the court's authority to set aside the award of a best-value contract was limited to situations where "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Id*. at 70-71. In the latter circumstance, the plaintiff had to show not only that there was a "violation of regulation or procedure," but also that there was "a 'clear and prejudicial violation of applicable statutes or regulations.' " *Id*. at 71 (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d

1166, 1169 (D.C. Cir. 1973)).  To make the requisite showing of prejudice, the plaintiff had to demonstrate "that there was a substantial chance it would have received the contract award absent the challenged agency action."  *Id*. (citation omitted) (internal quotation marks omitted).

In *Heritage*, that standard was met.  The court concluded that the government had wrongly determined that the plaintiff's bid was not compliant with the terms of the solicitation.  *Id.* at 74.  The court faulted the government for rejecting the plaintiff's bid for failing to comply with requirements that were not actually spelled out in the solicitation documents.  *Id*.  The violation was prejudicial because the plaintiff demonstrated that but for the government's wrongful conclusion that the plaintiff's bid did not comply, the plaintiff would have been within the "zone of consideration" for the award. *Id*. at 77.  Specifically, the plaintiff's "adjectival ratings on technical capability and past performance were equal to [the successful bidder's] and [the plaintiff's] price proposals were very close to" the price the successful bidder submitted.  *Id*.

The record in this case stands in marked contrast to the record in *Heritage*. Specifically, it is undisputed that the City evaluated the bidders using the factors the City said it would use and there is no dispute as to what those factors meant.  It is also undisputed that based on that evaluation, the successful bidder, First Transit, was ranked first.

In terms of price, which is arguably the only objective factor at issue in the process, First Transit's price ($19,674,750) was the lowest of the four bidders, and First Transit's price was almost $2 million less than RCL's price ($21,613,100).  The non-

price evaluation factors were: technical proposals (which accounted for 40 percent of the non-price component of the score); past performance (which accounted for 20 percent of the non-price component of the score); financial ability (which accounted for 10 percent of the non-price component of the score); and interviews with key staff (which accounted for 30 percent of the non-price component of the score). There is no dispute that First Transit's score was higher than RCL's score on each one of the four non-price factors.[1] Indeed, First Transit was ranked first of the four bidders on the basis of the total evaluation of the non-price factors and it received over 400 more points than RCL.[2]

We have recognized that an "agency's conclusions are not arbitrary and capricious so long as a 'rational connection between the facts found and the choice made' has been articulated." *In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.*, 624 N.W.2d 264, 277 (Minn. 2001) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)); *see also Antarctic Support Assocs. v. United States*, 46 Fed. Cl. 145, 155 (2000) (noting that challengers "must do more than point out mere 'mistakes' or 'missteps;' they must 'show that the claimed misstep was so excessive as to fall outside the decision-maker's ambit of discretion.' " (citation omitted)). Given that it

---

[1] The scores were: Technical Proposals—First Transit 666.5, RCL 546; Past Performance—First Transit 289.5, RCL 103; Financial Ability—First Transit 200, RCL 100; and Interviews—First Transit 457, RCL 426. First Transit's score was the highest on two of the four factors (technical proposals and past performance), tied for the highest score with two other bidders (Veolia and MV Transportation) on financial ability, and second (to Veolia) on the interview factor.

[2] First Transit received 1613 points and was ranked first; MV Transportation received 1478 points and was ranked second; Veolia received 1413 points and was ranked third; and RCL received 1175 points and was ranked fourth.

is undisputed that the City used the evaluation factors it said it would use and that First Transit received the highest ranking on both parts of that evaluation process (price and non-price factors), I would hold that the City's determination that First Transit's proposal represented the best value for the City is rationally connected to the facts and therefore is not arbitrary and capricious.

The majority goes a different route, applying our traditional summary judgment standard to remand the matter for trial. The majority concludes that there is a genuine issue as to whether the City was biased against RCL. The majority cites two facts to support its conclusion that the City awarded the contract through an unfair and biased process. In my view, the facts on which the majority relies do not create an issue for trial when our standard of review is properly applied.[3]

The majority first cites the fact that First Transit's bid listed two RCL employees as prospective managers that First Transit indicated it would hire if First Transit received the contract from the City. But when the City interviewed the bidders' management teams, the City allowed First Transit to substitute these prospective managers with two of First Transit's existing employees. The City then gave First Transit credit for the interview scores of the two RCL employees, even though RCL also got credit for these interviews because these employees were interviewed as part of RCL's own bid proposal.

---

[3] The majority says that it does not mean to suggest that no other issues raised by RCL establish genuine issues of material fact for trial. But the majority does not identify any other facts that it contends are material and disputed, and therefore my response is necessarily limited to these two alleged factual disputes.

There is no dispute of fact over how the City handled or scored the interviews of the two RCL employees. The parties agree that First Transit was allowed to substitute others and that the City counted the interviews of the RCL employees twice, once for First Transit and once for RCL. Even though there is not a factual dispute on the issue, the majority still concludes that how the City scored the interviews supports reversal of summary judgment. The majority apparently concludes that the City's double-counting amounts to a showing that the City improperly favored First Transit to the detriment of RCL.

But even if the City's handling of the interviews supported the inference of bias, a trial is still not necessary in my view because RCL has not demonstrated that it was prejudiced. First Transit, despite any advantage it may have received, scored lower than another bidder, Veolia, on the interview factor. And perhaps even more importantly, RCL trailed *all* other bidders on the evaluation of the non-price factors in total, and on the interview category specifically.[4] That the City gave both First Transit and RCL credit for these interviews therefore is simply not material. *O'Malley v. Ulland Bros.*, 549 N.W.2d 889, 892 (Minn. 1996) (noting that to defeat summary judgment a fact must be "material" and to be material, the fact must "affect the outcome or result of a case"); *see also Hawpe Constr., Inc. v. United States*, 46 Fed. Cl. 571, 579 (2000) (concluding that the agency erred but affirming its decision because "to prevail in a protest the protester must show not only a significant error in the procurement process, but also that

---

[4]     Veolia got the most points on the interview factor (466), First Transit was second (457), MV Transportation was third (445), and RCL was last (426).

the error prejudiced it." (citation omitted)). In my view, the district court accurately assessed this issue as "more molehill than mountain," and correctly concluded that it would not have affected the outcome of the City's bid selection.

The majority next relies on the fact that two City employees who were on the evaluation committee initially agreed to serve as references for RCL but then withdrew as references based on the advice of the City. The City employees did not inform RCL that they had withdrawn, which prevented RCL from finding replacement references and reduced the total number of points available to RCL in the past performance factor. Again, the parties do not dispute the facts on this issue.

As to this issue, the district court found that the omission of the City employee references negatively impacted RCL's score. But, as the court determined, the City's mishandling of the references does not support the conclusion that RCL is entitled to relief. This is so because even if RCL received a perfect score of 50 points from every evaluator on the past performance factor (an unlikely feat, given that no evaluator gave *any* bidder a score higher than 40), RCL's total score would have only increased its overall ranking on the non-price factors from fourth place to third and RCL's score would still have been almost 150 points below that received by First Transit. Therefore, even if RCL had provided additional references and those references were so positively received that RCL got a perfect score from the evaluators on the past performance factor, RCL still would not have demonstrated that it would have had a "substantial chance" at being awarded the contract. *Heritage*, 77 Fed Cl. at 71. In other words, this issue, like the issue discussed above, is simply not material to the outcome.

The majority faults the district court for drawing inferences against RCL and for ignoring contradictory evidence. But the majority does not identify any evidence which contradicts that discussed above. What the majority is really doing is highlighting conflicting inferences that may be drawn from undisputed evidence. In other words, even if the facts as to the interview process and the references are undisputed, it is theoretically possible to conclude that those facts support the inference that the City was biased against RCL. But in the context of assessing whether a decision is arbitrary and capricious, we have recognized that "[w]here there is room for two opinions on the matter, such action is not 'arbitrary and capricious,' even though it may be believed that an erroneous conclusion has been reached." *Brown v. Wells*, 288 Minn. 468, 472, 181 N.W.2d 708, 711 (1970). This is especially true when, as here, the losing bidder has not demonstrated that it suffered the requisite prejudice from the City's missteps.

In my view, the district court appropriately reviewed the evidence in the record, determined that there were no disputed issues of material fact, and concluded that RCL had not demonstrated that the City's decision should be set aside as arbitrary and capricious. It is frankly unclear what the district court should do differently on remand; the record is already developed, and there is no disputed evidence to weigh. The majority's holding suggests that a trial will be necessary anytime a party presents a shred of evidence challenging an agency decision. But this is directly contrary to the deference called for by an arbitrary and capricious standard of review. *See Leahy v. Raytheon Co.*, 315 F.3d 11, 17 (1st Cir. 2002) (noting the "obvious discongruence" between the arbitrary and capricious standard and the summary judgment standard); *Preserve*

*Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs.*, 87 F.3d 1242, 1246 (11th Cir. 1996) ("[E]ven in the context of summary judgment, an agency action is entitled to great deference."). I would affirm the court of appeals and hold that the district court did not err.